(Slip Opinion) OCTOBER TERM, 2009 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## SHADY GROVE ORTHOPEDIC ASSOCIATES, P. A. *v.* ALLSTATE INSURANCE CO.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 08–1008. Argued November 2, 2009—Decided March 31, 2010

After respondent Allstate refused to remit the interest due under New York law on petitioner Shady Grove's insurance claim, Shady Grove filed this class action in diversity to recover interest Allstate owed it and others. Despite the class action provisions set forth in Federal Rule of Civil Procedure 23, the District Court held itself deprived of jurisdiction by N. Y. Civ. Prac. Law Ann. §901(b), which precludes a class action to recover a "penalty" such as statutory interest. Affirming, the Second Circuit acknowledged that a Federal Rule adopted in compliance with the Rules Enabling Act, 28 U. S. C. §2072, would control if it conflicted with §901(b), but held there was no conflict because §901(b) and Rule 23 address different issues—eligibility of the particular type of claim for class treatment and certifiability of a given class, respectively. Finding no Federal Rule on point, the Court of Appeals held that §901(b) must be applied by federal courts sitting in diversity because it is "substantive" within the meaning of *Erie R. Co.* v. *Tompkins*, 304 U. S. 64 (1938).

*Held:* The judgment is reversed, and the case is remanded.

549 F. 3d 137, reversed and remanded.

JUSTICE SCALIA delivered the opinion of the Court with respect to PARTS I and II–A, concluding that §901(b) does not preclude a federal district court sitting in diversity from entertaining a class action under Rule 23. Pp. 3–12.

(a) If Rule 23 answers the question in dispute, it governs here unless it exceeds its statutory authorization or Congress's rulemaking power. *Burlington Northern R. Co.* v. *Woods,* 480 U. S. 1, 4–5. Pp. 3–4.

2          SHADY GROVE ORTHOPEDIC ASSOCIATES, P. A.
*v.* ALLSTATE INS. CO.

Syllabus

(b) Rule 23(b) answers the question in dispute—whether Shady Grove's suit may proceed as a class action—when it states that "[a] class action may be maintained" if certain conditions are met. Since §901(b) attempts to answer the same question, stating that Shady Grove's suit "may not be maintained as a class action" because of the relief it seeks, that provision cannot apply in diversity suits unless Rule 23 is ultra vires. The Second Circuit's view that §901(b) and Rule 23 address different issues is rejected. The line between eligibility and certifiability is entirely artificial and, in any event, Rule 23 explicitly empowers a federal court to certify a class in every case meeting its criteria. Allstate's arguments based on the exclusion of some federal claims from Rule 23's reach pursuant to federal statutes and on §901's structure are unpersuasive. Pp. 4–6.

(c) The dissent's claim that §901(b) can coexist with Rule 23 because it addresses only the remedy available to class plaintiffs is foreclosed by §901(b)'s text, notwithstanding its perceived purpose. The principle that courts should read ambiguous Federal Rules to avoid overstepping the authorizing statute, 28 U. S. C. §2072(b), does not apply because Rule 23 is clear. The dissent's approach does not avoid a conflict between §901(b) and Rule 23 but instead would render Rule 23 partially invalid. Pp. 6–12.

JUSTICE SCALIA, joined by THE CHIEF JUSTICE, JUSTICE THOMAS, and JUSTICE SOTOMAYOR, concluded in Parts II–B and II–D:

(a) The Rules Enabling Act, 28 U. S. C. §2072, not *Erie*, controls the validity of a Federal Rule of Procedure. Section 2072(b)'s requirement that federal procedural rules "not abridge, enlarge or modify any substantive right" means that a Rule must "really regulat[e] procedure,—the judicial process for enforcing rights and duties recognized by substantive law and for justly administering remedy and redress for disregard or infraction of them," *Sibbach* v. *Wilson & Co.*, 312 U. S. 1, 14. Though a Rule may incidentally affect a party's rights, it is valid so long as it regulates only the process for enforcing those rights, and not the rights themselves, the available remedies, or the rules of decision for adjudicating either. Rule 23 satisfies that criterion, at least insofar as it allows willing plaintiffs to join their separate claims against the same defendants. Allstate's arguments asserting §901(b)'s substantive impact are unavailing: It is not the substantive or procedural nature of the affected state law that matters, but that of the Federal Rule. See, *e.g., id.*, at 14. Pp. 12–16.

(b) Opening federal courts to class actions that cannot proceed in state court will produce forum shopping, but that is the inevitable result of the uniform system of federal procedure that Congress created. P. 22.

JUSTICE SCALIA, joined by THE CHIEF JUSTICE and JUSTICE THOMAS,

concluded in Part II–C that the concurrence's analysis—under which a Federal Rule may displace a state procedural rule that is not "bound up" or "sufficiently intertwined" with substantive rights and remedies under state law—squarely conflicts with *Sibbach*'s single criterion that the Federal Rule "really regulat[e] procedure," 312 U. S., at 13–14. Pp. 16–22.

    JUSTICE STEVENS agreed that Federal Rule of Civil Procedure 23 must apply because it governs whether a class must be certified, and it does not violate the Rules Enabling Act in this case. Pp. 1–22.

        (a) When the application of a federal rule would "abridge, enlarge or modify any substantive right," 28 U. S. C. §2072(b), the federal rule cannot govern. In rare cases, a federal rule that dictates an answer to a traditionally procedural question could, if applied, displace an unusual state law that is procedural in the ordinary use of the term but is so intertwined with a state right or remedy that it functions to define the scope of the state-created right. Examples may include state laws that make it significantly more difficult to bring or to prove a claim or that function as limits on the amount of recovery. An application of a federal rule that directly collides with such a state law violates the Rules Enabling Act. Pp. 1–13.

        (b) N. Y. Civ. Prac. Law Ann. §901(b), however, is not such a state law. It is a procedural rule that is not part of New York's substantive law. Pp. 17–22.

SCALIA, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I and II–A, in which ROBERTS, C. J., and STEVENS, THOMAS, and SOTOMAYOR, JJ., joined, an opinion with respect to Parts II–B and II–D, in which ROBERTS, C. J., and THOMAS, and SOTOMAYOR, JJ., joined, and an opinion with respect to Part II–C, in which ROBERTS, C. J., and, THOMAS, J., joined. STEVENS, J., filed an opinion concurring in part and concurring in the judgment. GINSBURG, J., filed a dissenting opinion, in which KENNEDY, BREYER, and ALITO, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———————

No. 08–1008

———————

## SHADY GROVE ORTHOPEDIC ASSOCIATES, P. A., PETITIONER *v.* ALLSTATE INSURANCE COMPANY

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[March 31, 2010]

JUSTICE SCALIA announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I and II–A, an opinion with respect to Parts II–B and II–D, in which THE CHIEF JUSTICE, JUSTICE THOMAS, and JUSTICE SOTOMAYOR join, and an opinion with respect to Part II–C, in which THE CHIEF JUSTICE and JUSTICE THOMAS join.

New York law prohibits class actions in suits seeking penalties or statutory minimum damages.[1]  We consider

———————

[1] N. Y. Civ. Prac. Law Ann. §901 (West 2006) provides:

"(a) One or more members of a class may sue or be sued as representative parties on behalf of all if:

"1. the class is so numerous that joinder of all members, whether otherwise required or permitted, is impracticable;

"2. there are questions of law or fact common to the class which predominate over any questions affecting only individual members;

"3. the claims or defenses of the representative parties are typical of the claims or defenses of the class;

"4. the representative parties will fairly and adequately protect the interests of the class; and

"5. a class action is superior to other available methods for the fair

whether this precludes a federal district court sitting in diversity from entertaining a class action under Federal Rule of Civil Procedure 23.[2]

## I

The petitioner's complaint alleged the following: Shady Grove Orthopedic Associates, P. A., provided medical care to Sonia E. Galvez for injuries she suffered in an automobile accident. As partial payment for that care, Galvez assigned to Shady Grove her rights to insurance benefits under a policy issued in New York by Allstate Insurance Co. Shady Grove tendered a claim for the assigned benefits to Allstate, which under New York law had 30 days to pay the claim or deny it. See N. Y. Ins. Law Ann. §5106(a) (West 2009). Allstate apparently paid, but not on time, and it refused to pay the statutory interest that accrued on the overdue benefits (at two percent per month), see *ibid.*

Shady Grove filed this diversity suit in the Eastern District of New York to recover the unpaid statutory interest. Alleging that Allstate routinely refuses to pay

_____

and efficient adjudication of the controversy.

"(b) Unless a statute creating or imposing a penalty, or a minimum measure of recovery specifically authorizes the recovery thereof in a class action, an action to recover a penalty, or minimum measure of recovery created or imposed by statute may not be maintained as a class action."

[2] Rule 23(a) provides:

"(a) Prerequisites. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

"(1) the class is so numerous that joinder of all members is impracticable;

"(2) there are questions of law or fact common to the class;

"(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

"(4) the representative parties will fairly and adequately protect the interests of the class."

Subsection (b) says that "[a] class action may be maintained if Rule 23 (a) is satisfied and if" the suit falls into one of three described categories (irrelevant for present purposes).

interest on overdue benefits, Shady Grove sought relief on behalf of itself and a class of all others to whom Allstate owes interest. The District Court dismissed the suit for lack of jurisdiction. 466 F. Supp. 2d 467 (2006). It reasoned that N. Y. Civ. Prac. Law Ann. §901(b), which precludes a suit to recover a "penalty" from proceeding as a class action, applies in diversity suits in federal court, despite Federal Rule of Civil Procedure 23. Concluding that statutory interest is a "penalty" under New York law, it held that §901(b) prohibited the proposed class action. And, since Shady Grove conceded that its individual claim (worth roughly $500) fell far short of the amount-in-controversy requirement for individual suits under 28 U. S. C. §1332(a), the suit did not belong in federal court.[3]

The Second Circuit affirmed. 549 F. 3d 137 (2008). The court did not dispute that a federal rule adopted in compliance with the Rules Enabling Act, 28 U. S. C. §2072, would control if it conflicted with §901(b). But there was no conflict because (as we will describe in more detail below) the Second Circuit concluded that Rule 23 and §901(b) address different issues. Finding no federal rule on point, the Court of Appeals held that §901(b) is "substantive" within the meaning of *Erie R. Co.* v. *Tompkins*, 304 U. S. 64 (1938), and thus must be applied by federal courts sitting in diversity.

We granted certiorari, 556 U. S. \_\_\_ (2009).

## II

The framework for our decision is familiar. We must first determine whether Rule 23 answers the question in dispute. *Burlington Northern R. Co.* v. *Woods*, 480 U. S. 1,

---

[3] Shady Grove had asserted jurisdiction under 28 U. S. C. §1332(d)(2), which relaxes, for class actions seeking at least $5 million, the rule against aggregating separate claims for calculation of the amount in controversy. See *Exxon Mobil Corp.* v. *Allapattah Services, Inc.*, 545 U. S. 546, 571 (2005).

4    SHADY GROVE ORTHOPEDIC ASSOCIATES, P. A.
*v.* ALLSTATE INS. CO.

Opinion of the Court

4–5 (1987). If it does, it governs—New York's law not-withstanding—unless it exceeds statutory authorization or Congress's rulemaking power. *Id.*, at 5; see *Hanna* v. *Plumer*, 380 U. S. 460, 463–464 (1965). We do not wade into *Erie*'s murky waters unless the federal rule is inapplicable or invalid. See 380 U. S., at 469–471.

A

The question in dispute is whether Shady Grove's suit may proceed as a class action. Rule 23 provides an answer. It states that "[a] class action may be maintained" if two conditions are met: The suit must satisfy the criteria set forth in subdivision (a) (*i.e.*, numerosity, commonality, typicality, and adequacy of representation), and it also must fit into one of the three categories described in subdivision (b). Fed. Rule Civ. Proc. 23(b). By its terms this creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action. (The Federal Rules regularly use "may" to confer categorical permission, see, *e.g.*, Fed. Rules Civ. Proc. 8(d)(2)–(3), 14(a)(1), 18(a)–(b), 20(a)(1)–(2), 27(a)(1), 30(a)(1), as do federal statutes that establish procedural entitlements, see, *e.g.,* 29 U. S. C. §626(c)(1); 42 U. S. C. §2000e–5(f)(1).) Thus, Rule 23 provides a one-size-fits-all formula for deciding the class-action question. Because §901(b) attempts to answer the same question—*i.e.*, it states that Shady Grove's suit "may *not* be maintained as a class action" (emphasis added) because of the relief it seeks—it cannot apply in diversity suits unless Rule 23 is ultra vires.

The Second Circuit believed that §901(b) and Rule 23 do not conflict because they address different issues. Rule 23, it said, concerns only the criteria for determining whether a given class can and should be certified; section 901(b), on the other hand, addresses an antecedent question: whether the particular type of claim is eligible for class

treatment in the first place—a question on which Rule 23 is silent. See 549 F. 3d, at 143–144. Allstate embraces this analysis. Brief for Respondent 12–13.

We disagree. To begin with, the line between eligibility and certifiability is entirely artificial. Both are preconditions for maintaining a class action. Allstate suggests that eligibility must depend on the "particular cause of action" asserted, instead of some other attribute of the suit, *id.*, at 12. But that is not so. Congress could, for example, provide that only claims involving more than a certain number of plaintiffs are "eligible" for class treatment in federal court. In other words, relabeling Rule 23(a)'s prerequisites "eligibility criteria" would obviate Allstate's objection—a sure sign that its eligibility-certifiability distinction is made-to-order.

There is no reason, in any event, to read Rule 23 as addressing only whether claims made eligible for class treatment by some *other* law should be certified as class actions. Allstate asserts that Rule 23 neither explicitly nor implicitly empowers a federal court "to certify a class in each and every case" where the Rule's criteria are met. *Id.*, at 13–14. But that is *exactly* what Rule 23 does: It says that if the prescribed preconditions are satisfied "[a] class action *may be maintained*" (emphasis added)—not "*a class action may be permitted.*" Courts do not maintain actions; litigants do. The discretion suggested by Rule 23's "may" is discretion residing in the plaintiff: He may bring his claim in a class action if he wishes. And like the rest of the Federal Rules of Civil Procedure, Rule 23 *automatically* applies "in all civil actions and proceedings in the United States district courts," Fed. Rule Civ. Proc. 1. See *Califano* v. *Yamasaki*, 442 U. S. 682, 699–700 (1979).

Allstate points out that Congress has carved out some federal claims from Rule 23's reach, see, *e.g.*, 8 U. S. C. §1252(e)(1)(B)—which shows, Allstate contends, that Rule 23 does not authorize class actions for all claims, but

rather leaves room for laws like §901(b). But Congress, unlike New York, has ultimate authority over the Federal Rules of Civil Procedure; it can create exceptions to an individual rule as it sees fit—either by directly amending the rule or by enacting a separate statute overriding it in certain instances. Cf. *Henderson* v. *United States*, 517 U. S. 654, 668 (1996). The fact that Congress has created specific exceptions to Rule 23 hardly proves that the Rule does not apply generally. In fact, it proves the opposite. If Rule 23 did *not* authorize class actions across the board, the statutory exceptions would be unnecessary.

Allstate next suggests that the structure of §901 shows that Rule 23 addresses only certifiability. Section 901(*a*), it notes, establishes class-certification criteria roughly analogous to those in Rule 23 (wherefore it agrees *that* subsection is pre-empted). But §901(b)'s rule barring class actions for certain claims is set off as its own subsection, and where it applies §901(a) does not. This shows, according to Allstate, that §901(b) concerns a separate subject. Perhaps it does concern a subject separate from the subject of §901(a). But the question before us is whether it concerns a subject separate from the subject of *Rule 23—* and for purposes of answering *that* question the way New York has structured its statute is immaterial. Rule 23 permits all class actions that meet its requirements, and a State cannot limit that permission by structuring one part of its statute to track Rule 23 and enacting another part that imposes additional requirements. Both of §901's subsections undeniably answer the same question as Rule 23: whether a class action may proceed for a given suit. Cf. *Burlington*, 480 U. S., at 7–8.

The dissent argues that §901(b) has nothing to do with whether Shady Grove may maintain its suit as a class action, but affects only the *remedy* it may obtain if it wins. See *post*, at 8–17 (opinion of GINSBURG, J.). Whereas "Rule 23 governs procedural aspects of class litigation" by

"prescrib[ing] the considerations relevant to class certifica-
tion and postcertification proceedings," §901(b) addresses
only "the size of a monetary award a class plaintiff may
pursue." *Post*, at 11–12. Accordingly, the dissent says,
Rule 23 and New York's law may coexist in peace.

We need not decide whether a state law that limits the
remedies available in an existing class action would con-
flict with Rule 23; that is not what §901(b) does. By its
terms, the provision precludes a plaintiff from "main-
tain[ing]" a class action seeking statutory penalties.
Unlike a law that sets a ceiling on damages (or puts other
remedies out of reach) in properly filed class actions,
§901(b) says nothing about what remedies a court may
award; it prevents the class actions it covers from coming
into existence at all.[4] Consequently, a court bound by
§901(b) could not certify a class action seeking both statu-
tory penalties and other remedies even if it announces in
advance that it will refuse to award the penalties in the
event the plaintiffs prevail; to do so would violate the
statute's clear prohibition on "maintain[ing]" such suits as
class actions.

The dissent asserts that a plaintiff can avoid §901(b)'s
barrier by omitting from his complaint (or removing) a
request for statutory penalties. See *post*, at 14–15. Even
assuming all statutory penalties are waivable,[5] the fact

---

[4] Contrary to the dissent's implication, *post*, at 13, we express no view
as to whether state laws that set a ceiling on damages recoverable in a
single suit, see App. A to Brief for Respondent, are pre-empted.
Whether or not those laws conflict with Rule 23, §901(b) does conflict
because it addresses not the remedy, but the procedural right to main-
tain a class action. As Allstate and the dissent note, several federal
statutes also limit the recovery available in class actions. See, *e.g.*, 12
U. S. C. §2605(f)(2)(B); 15 U. S. C. §1640(a)(2)(B); 29 U. S. C.
§1854(c)(1). But Congress has plenary power to override the Federal
Rules, so its enactments, unlike those of the States, prevail even in case
of a conflict.

[5] But see, *e.g.*, *Asher* v. *Abbott Labs.*, 290 App. Div. 2d 208, 737

that a complaint omitting them could be brought as a class action would not at all prove that §901(b) is addressed only to remedies. If the state law instead banned class actions for fraud claims, a would-be class-action plaintiff could drop the fraud counts from his complaint and proceed with the remainder in a class action. Yet that would not mean the law provides no remedy for fraud; the ban would affect only the procedural means by which the remedy may be pursued. In short, although the dissent correctly abandons Allstate's eligibility-certifiability distinction, the alternative it offers fares no better.

The dissent all but admits that the literal terms of §901(b) address the same subject as Rule 23—*i.e.*, whether a class action may be maintained—but insists the provision's *purpose* is to restrict only remedies. See *post*, at 12–15; *post*, at 15 ("[W]hile phrased as responsive to the question whether certain class actions may begin, §901(b) is unmistakably aimed at controlling how those actions must end"). Unlike Rule 23, designed to further procedural fairness and efficiency, §901(b) (we are told) "responds to an entirely different concern": the fear that allowing statutory damages to be awarded on a class-wide basis would "produce overkill." *Post*, at 12, 9 (internal quotation marks omitted). The dissent reaches this conclusion on the basis of (1) constituent concern recorded in the law's bill jacket; (2) a commentary suggesting that the Legislature "apparently fear[ed]" that combining class actions and statutory penalties "could result in annihilating punishment of the defendant," V. Alexander, Practice Commentaries, C901:11, reprinted in 7B McKinney's Consolidated Laws of New York Ann., p. 104 (2006) (internal quotation marks omitted); (3) a remark by the Governor in his signing statement that §901(b) "'provides

_____

N. Y. S. 2d 4 (2002) (treble damages under N. Y. Gen. Bus. Law §340(5) are nonwaivable, wherefore class actions under that law are barred).

a controlled remedy,'" *post*, at 9 (quoting Memorandum on Approving L. 1975, Ch. 207, reprinted in 1975 N. Y. Laws, at 1748; emphasis deleted), and (4) a state court's statement that the final text of §901(b) "'was the result of a compromise among competing interests,'" *post*, at 9 (quoting *Sperry* v. *Crompton Corp.*, 8 N. Y. 3d 204, 211, 863 N. E. 2d 1012, 1015 (2007)).

This evidence of the New York Legislature's purpose is pretty sparse. But even accepting the dissent's account of the Legislature's objective at face value, it cannot override the statute's clear text. Even if its aim is to restrict the remedy a plaintiff can obtain, §901(b) achieves that end by limiting a plaintiff's power to maintain a class action. The manner in which the law "could have been written," *post*, at 23, has no bearing; what matters is the law the Legislature *did* enact. We cannot rewrite that to reflect our perception of legislative purpose, see *Oncale* v. *Sundowner Offshore Services, Inc.*, 523 U. S. 75, 79–80 (1998).[6] The dissent's concern for state prerogatives is frustrated rather than furthered by revising state laws when a po-

———————

[6] Our decision in *Walker* v. *Armco Steel Corp.*, 446 U. S. 740 (1980), discussed by the dissent, *post*, at 5–6, 13–14, n. 8, is not to the contrary. There we held that Rule 3 (which provides that a federal civil action is "'commenced'" by filing a complaint in federal court) did not displace a state law providing that "'[a]n action shall be deemed commenced, *within the meaning of this article [the statute of limitations]*, as to each defendant, at the date of the summons which is served on him . . . .'" 446 U. S., at 743, n. 4 (quoting Okla. Stat., Tit. 12, §97 (1971); alteration in original, emphasis added). Rule 3, we explained, "governs the date from which various timing requirements of the Federal Rules begin to run, but does not affect state statutes of limitations" or tolling rules, which it did not "purpor[t] to displace." 446 U. S., at 751, 750. The texts were therefore not in conflict. While our opinion observed that the State's actual-service rule was (in the State's judgment) an "integral part of the several policies served by the statute of limitations," *id.*, at 751, nothing in our decision suggested that a federal court may resolve an obvious conflict between the texts of state and federal rules by resorting to the state law's ostensible objectives.

tential conflict with a Federal Rule arises; the state-friendly approach would be to accept the law as written and test the validity of the Federal Rule.

The dissent's approach of determining whether state and federal rules conflict based on the subjective intentions of the state legislature is an enterprise destined to produce "confusion worse confounded," *Sibbach* v. *Wilson & Co.*, 312 U. S. 1, 14 (1941). It would mean, to begin with, that one State's statute could survive pre-emption (and accordingly affect the procedures in federal court) while another State's identical law would not, merely because its authors had different aspirations. It would also mean that district courts would have to discern, in every diversity case, the purpose behind any putatively pre-empted state procedural rule, even if its text squarely conflicts with federal law. That task will often prove arduous. Many laws further more than one aim, and the aim of others may be impossible to discern. Moreover, to the extent the dissent's purpose-driven approach depends on its characterization of §901(b)'s aims as substantive, it would apply to many state rules ostensibly addressed to procedure. Pleading standards, for example, often embody policy preferences about the types of claims that should succeed—as do rules governing summary judgment, pretrial discovery, and the admissibility of certain evidence. Hard cases will abound. It is not even clear that a state supreme court's pronouncement of the law's purpose would settle the issue, since existence of the factual predicate for avoiding federal pre-emption is ultimately a federal question. Predictably, federal judges would be condemned to poring through state legislative history—which may be less easily obtained, less thorough, and less familiar than its federal counterpart, see R. Mersky & D. Dunn, Fundamentals of Legal Research 233 (8th ed. 2002); Torres & Windsor, State Legislative Histories: A Select, Annotated Bibliography, 85 L. Lib. J. 545, 547 (1993).

But while the dissent does indeed artificially narrow the scope of §901(b) by finding that it pursues only substantive policies, that is not the central difficulty of the dissent's position. The central difficulty is that even artificial narrowing cannot render §901(b) compatible with Rule 23. *Whatever* the policies they pursue, they flatly contradict each other. Allstate asserts (and the dissent implies, see *post*, at 3, 11) that we can (and must) *interpret* Rule 23 in a manner that avoids overstepping its authorizing statute.[7] If the Rule were susceptible of two meanings—one that would violate §2072(b) and another that would not— we would agree. See *Ortiz* v. *Fibreboard Corp.*, 527 U. S. 815, 842, 845 (1999); cf. *Semtek Int'l Inc.* v. *Lockheed Martin Corp.*, 531 U. S. 497, 503–504 (2001). But it is not. Rule 23 unambiguously authorizes *any* plaintiff, in *any* federal civil proceeding, to maintain a class action if the Rule's prerequisites are met. We cannot contort its text, even to avert a collision with state law that might render

———————

[7] The dissent also suggests that we should read the Federal Rules "'with sensitivity to important state interests'" and "'to avoid conflict with important state regulatory policies.'" *Post*, at 7 (quoting *Gasperini* v. *Center for Humanities, Inc.*, 518 U. S. 415, 427, n. 7, 438, n. 22 (1996)). The search for state interests and policies that are "important" is just as standardless as the "important or substantial" criterion we rejected in *Sibbach* v. *Wilson & Co.*, 312 U. S. 1, 13–14 (1941), to define the state-created rights a Federal Rule may not abridge.

If all the dissent means is that we should read an ambiguous Federal Rule to avoid "substantial variations [in outcomes] between state and federal litigation," *Semtek Int'l Inc.* v. *Lockheed Martin Corp.*, 531 U. S. 497, 504 (2001) (internal quotation marks omitted), we entirely agree. We should do so not to avoid doubt as to the Rule's validity—since a Federal Rule that fails *Erie*'s forum-shopping test is not *ipso facto* invalid, see *Hanna* v. *Plumer*, 380 U. S. 460, 469–472 (1965)—but because it is reasonable to assume that "Congress is just as concerned as we have been to avoid significant differences between state and federal courts in adjudicating claims," *Stewart Organization, Inc.* v. *Ricoh Corp.*, 487 U. S. 22, 37–38 (1988) (SCALIA, J., dissenting). The assumption is irrelevant here, however, because there is only one reasonable reading of Rule 23.

12      SHADY GROVE ORTHOPEDIC ASSOCIATES, P. A.
*v.* ALLSTATE INS. CO.

Opinion of SCALIA, J.

it invalid.  See *Walker* v. *Armco Steel Corp.*, 446 U. S. 740, 750, n. 9 (1980).[8]  What the dissent's approach achieves is not the avoiding of a "conflict between Rule 23 and §901(b)," *post*, at 17, but rather the invalidation of Rule 23 (pursuant to §2072(b) of the Rules Enabling Act) to the extent that it conflicts with the substantive policies of §901.  There is no other way to reach the dissent's destination.  We must therefore confront head-on whether Rule 23 falls within the statutory authorization.

B

*Erie* involved the constitutional power of federal courts to supplant state law with judge-made rules.  In that context, it made no difference whether the rule was technically one of substance or procedure; the touchstone was whether it "significantly affect[s] the result of a litigation." *Guaranty Trust Co.* v. *York*, 326 U. S. 99, 109 (1945).  That is not the test for either the constitutionality or the statutory validity of a Federal Rule of Procedure.  Congress has undoubted power to supplant state law, and undoubted power to prescribe rules for the courts it has created, so long as those rules regulate matters "rationally capable of classification" as procedure.  *Hanna*, 380 U. S., at 472.  In the Rules Enabling Act, Congress authorized this Court to promulgate rules of procedure subject to its review, 28 U. S. C. §2072(a), but with the limitation that those rules "shall not abridge, enlarge or modify any substantive right," §2072(b).

We have long held that this limitation means that the Rule must "really regulat[e] procedure,—the judicial

––––––––

[8] The cases chronicled by the dissent, see *post*, at 3–8, each involved a Federal Rule that we concluded could fairly be read not to "control the issue" addressed by the pertinent state law, thus avoiding a "direct collision" between federal and state law, *Walker*, 446 U. S., at 749 (internal quotation marks omitted).  But here, as in *Hanna*, *supra*, at 470, a collision is "unavoidable."

process for enforcing rights and duties recognized by substantive law and for justly administering remedy and redress for disregard or infraction of them," *Sibbach*, 312 U. S., at 14; see *Hanna*, *supra*, at 464; *Burlington*, 480 U. S., at 8. The test is not whether the rule affects a litigant's substantive rights; most procedural rules do. *Mississippi Publishing Corp.* v. *Murphree*, 326 U. S. 438, 445 (1946). What matters is what the rule itself *regulates:* If it governs only "the manner and the means" by which the litigants' rights are "enforced," it is valid; if it alters "the rules of decision by which [the] court will adjudicate [those] rights," it is not. *Id.*, at 446 (internal quotation marks omitted).

Applying that test, we have rejected every statutory challenge to a Federal Rule that has come before us. We have found to be in compliance with §2072(b) rules prescribing methods for serving process, see *id.*, at 445–446 (Fed. Rule Civ. Proc. 4(f)); *Hanna*, *supra*, at 463–465 (Fed. Rule Civ. Proc. 4(d)(1)), and requiring litigants whose mental or physical condition is in dispute to submit to examinations, see *Sibbach*, *supra*, at 14–16 (Fed. Rule Civ. Proc. 35); *Schlagenhauf* v. *Holder*, 379 U. S. 104, 113–114 (1964) (same). Likewise, we have upheld rules authorizing imposition of sanctions upon those who file frivolous appeals, see *Burlington*, *supra*, at 8 (Fed. Rule App. Proc. 38), or who sign court papers without a reasonable inquiry into the facts asserted, see *Business Guides, Inc.* v. *Chromatic Communications Enterprises, Inc.*, 498 U. S. 533, 551–554 (1991) (Fed. Rule Civ. Proc. 11). Each of these rules had some practical effect on the parties' rights, but each undeniably regulated only the process for enforcing those rights; none altered the rights themselves, the available remedies, or the rules of decision by which the court adjudicated either.

Applying that criterion, we think it obvious that rules allowing multiple claims (and claims by or against multi-

ple parties) to be litigated together are also valid. See, *e.g.*, Fed. Rules Civ. Proc. 18 (joinder of claims), 20 (joinder of parties), 42(a) (consolidation of actions). Such rules neither change plaintiffs' separate entitlements to relief nor abridge defendants' rights; they alter only how the claims are processed. For the same reason, Rule 23—at least insofar as it allows willing plaintiffs to join their separate claims against the same defendants in a class action—falls within §2072(b)'s authorization. A class action, no less than traditional joinder (of which it is a species), merely enables a federal court to adjudicate claims of multiple parties at once, instead of in separate suits. And like traditional joinder, it leaves the parties' legal rights and duties intact and the rules of decision unchanged.

Allstate contends that the authorization of class actions is not substantively neutral: Allowing Shady Grove to sue on behalf of a class "transform[s] [the] dispute over a five *hundred* dollar penalty into a dispute over a five *million* dollar penalty." Brief for Respondent 1. Allstate's aggregate liability, however, does not depend on whether the suit proceeds as a class action. Each of the 1,000-plus members of the putative class could (as Allstate acknowledges) bring a freestanding suit asserting his individual claim. It is undoubtedly true that some plaintiffs who would not bring individual suits for the relatively small sums involved will choose to join a class action. That has no bearing, however, on Allstate's or the plaintiffs' legal rights. The likelihood that some (even many) plaintiffs will be induced to sue by the availability of a class action is just the sort of "incidental effec[t]" we have long held does not violate §2072(b), *Mississippi Publishing*, *supra*, at 445.

Allstate argues that Rule 23 violates §2072(b) because the state law it displaces, §901(b), creates a right that the Federal Rule abridges—namely, a "substantive

right . . . not to be subjected to aggregated class-action liability" in a single suit. Brief for Respondent 31. To begin with, we doubt that that is so. Nothing in the text of §901(b) (which is to be found in New York's procedural code) confines it to claims under New York law; and of course New York has no power to alter substantive rights and duties created by other sovereigns. As we have said, the *consequence* of excluding certain class actions may be to cap the damages a defendant can face in a single suit, but the law itself alters only procedure. In that respect, §901(b) is no different from a state law forbidding simple joinder. As a fallback argument, Allstate argues that even if §901(b) is a procedural provision, it was enacted "for *substantive reasons*," *id.*, at 24 (emphasis added). Its end was not to improve "the conduct of the litigation process itself" but to alter "the outcome of that process." *Id.*, at 26.

The fundamental difficulty with both these arguments is that the substantive nature of New York's law, or its substantive purpose, *makes no difference.* A Federal Rule of Procedure is not valid in some jurisdictions and invalid in others—or valid in some cases and invalid in others— depending upon whether its effect is to frustrate a state substantive law (or a state procedural law enacted for substantive purposes). That could not be clearer in *Sibbach:*

> "The petitioner says the phrase ['substantive rights' in the Rules Enabling Act] connotes more; that by its use Congress intended that in regulating procedure this Court should not deal with important and substantial rights theretofore recognized. Recognized where and by whom? The state courts are divided as to the power in the absence of statute to order a physical examination. In a number such an order is authorized by statute or rule. . . .
>
> "The asserted right, moreover, is no more important

than many others enjoyed by litigants in District Courts sitting in the several states before the Federal Rules of Civil Procedure altered and abolished old rights or privileges and created new ones in connection with the conduct of litigation. . . . If we were to adopt the suggested criterion of the importance of the alleged right we should invite endless litigation and confusion worse confounded. The test must be whether a rule really regulates procedure . . . ." 312 U. S., at 13–14 (footnotes omitted).

*Hanna* unmistakably expressed the same understanding that compliance of a Federal Rule with the Enabling Act is to be assessed by consulting the Rule itself, and not its effects in individual applications:

"[T]he court has been instructed to apply the Federal Rule, and can refuse to do so only if the Advisory Committee, this Court, and Congress erred in their prima facie judgment that the Rule in question transgresses neither the terms of the Enabling Act nor constitutional restrictions." 380 U. S., at 471.

In sum, it is not the substantive or procedural nature or purpose of the affected state law that matters, but the substantive or procedural nature of the Federal Rule. We have held since *Sibbach*, and reaffirmed repeatedly, that the validity of a Federal Rule depends entirely upon whether it regulates procedure. See *Sibbach*, *supra*, at 14; *Hanna*, *supra*, at 464; *Burlington*, 480 U. S., at 8. If it does, it is authorized by §2072 and is valid in all jurisdictions, with respect to all claims, regardless of its incidental effect upon state-created rights.

C

A few words in response to the concurrence. We understand it to accept the framework we apply—which requires first, determining whether the federal and state

rules can be reconciled (because they answer different questions), and second, if they cannot, determining whether the Federal Rule runs afoul of §2072(b). *Post*, at 5–7 (STEVENS, J., concurring in part and concurring in judgment). The concurrence agrees with us that Rule 23 and §901(b) conflict, *post*, at 15–16, and departs from us only with respect to the second part of the test, *i.e.*, whether application of the Federal Rule violates §2072(b), *post*, at 7–13. Like us, it answers no, but for a reason different from ours. *Post,* at 17–22.

The concurrence would decide this case on the basis, not that Rule 23 is procedural, but that the state law it displaces is procedural, in the sense that it does not "function as a part of the State's definition of substantive rights and remedies." *Post,* at 1. A state procedural rule is not preempted, according to the concurrence, so long as it is "so bound up with," or "sufficiently intertwined with," a substantive state-law right or remedy "that it defines the scope of that substantive right or remedy," *post*, at 4, 13.

This analysis squarely conflicts with *Sibbach*, which established the rule we apply. The concurrence contends that *Sibbach* did not rule out its approach, but that is not so. Recognizing the impracticability of a test that turns on the idiosyncrasies of state law, *Sibbach* adopted and applied a rule with a single criterion: whether the Federal Rule "really regulates procedure." 312 U. S., at 14.[9] That

---

[9] The concurrence claims that in *Sibbach* "[t]he Court . . . had no occasion to consider whether the particular application of the Federal Rules in question would offend the Enabling Act." *Post*, at 12. Had *Sibbach* been applying the concurrence's theory, that is quite true—which demonstrates how inconsistent that theory is with *Sibbach*. For conformity with the Rules Enabling Act was the *very issue Sibbach* decided: The petitioner's position was that Rules 35 and 37 exceeded the Enabling Act's authorization, 312 U. S., at 9, 13; the Court faced and rejected that argument, *id.*, at 13–16, and proceeded to reverse the lower court for failing to apply Rule 37 correctly, *id.*, at 16. There

the concurrence's approach would have yielded the same result in *Sibbach* proves nothing; what matters is the rule we *did* apply, and that rule leaves no room for special exemptions based on the function or purpose of a particular state rule.[10]  We have rejected an attempt to read into *Sibbach* an exception with no basis in the opinion, see *Schlagenhauf*, 379 U. S., at 113–114, and we see no reason to find such an implied limitation today.

In reality, the concurrence seeks not to apply *Sibbach*, but to overrule it (or, what is the same, to rewrite it).  Its approach, the concurrence insists, gives short shrift to the statutory text forbidding the Federal Rules from "abridg[ing], enlarg[ing], or modify[ing] any substantive right," §2072(b).  See *post,* at 9–10.  There is something to that.  It is possible to understand how it can be determined whether a Federal Rule "enlarges" substantive

_____

could not be a clearer rejection of the theory that the concurrence now advocates.

The concurrence responds that the "the specific question of 'the obligation of federal courts to apply the substantive law of a state'" was not before the Court, *post*, at 12 (quoting *Sibbach*, *supra*, at 9).  It is clear from the context, however, that this passage referred to the *Erie* prohibition of court-created rules that displace state law.  The opinion unquestionably dealt with the Federal Rules' compliance with §2072(b), and it adopted the standard we apply here to resolve the question, which does not depend on whether individual applications of the Rule abridge or modify state-law rights.  See 312 U. S., at 13–14.  To the extent *Sibbach* did not address the Federal Rules' validity vis-à-vis contrary state law, *Hanna* surely did, see 380 U. S., at 472, and it made clear that *Sibbach*'s test still controls, see 380 U. S., at 464–465, 470–471.

[10] The concurrence insists that we have misread *Sibbach*, since surely a Federal Rule that "in most cases" regulates procedure does not do so when it displaces one of those "rare" state substantive laws that are disguised as rules of procedure.  *Post*, at 13, n. 13.  This mistakes what the Federal Rule *regulates* for its incidental *effects*.  As we have explained, *supra*, at 12–13, most Rules have some effect on litigants' substantive rights or their ability to obtain a remedy, but that does not mean the Rule itself regulates those rights or remedies.

rights without consulting State law: If the Rule creates a substantive right, even one that duplicates some state-created rights, it establishes a new *federal* right. But it is hard to understand how it can be determined whether a Federal Rule "abridges" or "modifies" substantive rights without knowing what state-created rights would obtain if the Federal Rule did not exist. *Sibbach*'s exclusive focus on the challenged Federal Rule—driven by the very real concern that Federal Rules which vary from State to State would be chaos, see 312 U. S., at 13–14—is hard to square with §2072(b)'s terms.[11]

 *Sibbach* has been settled law, however, for nearly seven decades.[12]  Setting aside any precedent requires a "special

_____

 [11] The concurrence's approach, however, is itself unfaithful to the statute's terms. Section 2072(b) bans abridgement or modification only of "substantive rights," but the concurrence would prohibit pre-emption of "procedural rules that are intimately bound up in the scope of a substantive right or remedy," *post*, at 19. This would allow States to force a wide array of parochial procedures on federal courts so long as they are "sufficiently intertwined with a state right or remedy." *Post,* at 13.

 [12] The concurrence implies that *Sibbach* has slipped into desuetude, apparently for lack of sufficient citations. See *post*, at 13–14, n. 14. We are unaware of any rule to the effect that a holding of ours expires if the case setting it forth is not periodically revalidated. In any event, the concurrence's account of our shunning of *Sibbach* is greatly exaggerated. *Hanna* did not merely cite the case, but recognized it as establishing the governing rule. 380 U. S., at 464–465, 470–471. *Mississippi Publishing Corp.* v. *Murphree*, 326 U. S. 438, 445–446 (1946), likewise cited *Sibbach* and applied the same test, examining the Federal Rule, not the state law it displaced. True, *Burlington Northern R. Co.* v. *Woods*, 480 U. S. 1 (1987), and for that matter *Business Guides, Inc.* v. *Chromatic Communications Enterprises, Inc.*, 498 U. S. 533 (1991), did not cite *Sibbach*. But both cited and followed *Hanna*— which as noted held out *Sibbach* as setting forth the governing rule. See *Burlington Northern*, *supra*, at 5–6, 8; *Business Guides*, *supra*, at 552–554. Thus, while *Sibbach* itself may appear infrequently in the U. S. Reports, its rule—and in particular its focus on the Federal Rule as the proper unit of analysis—is alive and well.

 In contrast, *Hanna*'s obscure *obiter dictum* that a court "need not

justification" beyond a bare belief that it was wrong. *Patterson* v. *McLean Credit Union*, 491 U. S. 164, 172 (1989) (internal quotation marks omitted). And a party seeking to overturn a *statutory* precedent bears an even greater burden, since Congress remains free to correct us, *ibid.*, and adhering to our precedent enables it do so, see, *e.g.*, *Finley* v. *United States*, 490 U. S. 545, 556 (1989); 28 U. S. C. §1367; *Exxon Mobil Corp.* v. *Allapattah Services, Inc.*, 545 U. S. 546, 558 (2005). We do Congress no service by presenting it a moving target. In all events, Allstate has not even asked us to overrule *Sibbach*, let alone carried its burden of persuading us to do so. Cf. *IBP, Inc.* v. *Alvarez*, 546 U. S. 21, 32 (2005). Why we should cast aside our decades-old decision escapes us, especially since (as the concurrence explains) that would not affect the result.[13]

––––––––––

wholly blind itself" to a Federal Rule's effect on a case's outcome, 380 U. S., at 473—which the concurrence invokes twice, *post*, at 8, 13–14, n. 14—has never resurfaced in our opinions in the 45 years since its first unfortunate utterance. Nor does it cast doubt on *Sibbach*'s straightforward test: As the concurrence notes*, Hanna* cited *Sibbach* for that statement, 380 U. S., at 473, showing it saw no inconsistency between the two.

[13] The concurrence is correct, *post*, at 10, n. 9, that under our disposition any rule that "really regulates procedure," *Sibbach*, *supra*, at 14, will pre-empt a conflicting state rule, however "bound up" the latter is with substantive law. The concurrence is wrong, however, that that result proves our interpretation of §2072(b) implausible, *post*, at 10, n. 9. The result is troubling only if one stretches the term "substantive rights" in §2072(b) to mean not only state-law rights themselves, but also any state-law procedures closely connected to them. Neither the text nor our precedent supports that expansive interpretation. The examples the concurrence offers—statutes of limitations, burdens of proof, and standards for appellate review of damages awards—do not make its broad definition of substantive rights more persuasive. They merely illustrate that in rare cases it may be difficult to determine whether a rule "really regulates" procedure or substance. If one concludes the latter, there is no pre-emption of the state rule; the Federal Rule itself is invalid.

The concurrence also contends that applying *Sibbach* and assessing whether a Federal Rule regulates substance or procedure is not always easy. See *post*, at 11, n. 10. Undoubtedly some hard cases will arise (though we have managed to muddle through well enough in the 69 years since *Sibbach* was decided). But as the concurrence acknowledges, *post*, at 11, the basic difficulty is unavoidable: The statute itself refers to "substantive right[s]," §2072(b), so there is no escaping the substance-procedure distinction. What is more, the concurrence's approach does nothing to diminish the difficulty, but rather magnifies it many times over. Instead of a single hard question of whether a Federal Rule regulates substance or procedure, that approach will present hundreds of hard questions, forcing federal courts to assess the substantive or procedural character of countless state rules that may conflict with a single Federal Rule.[14] And it still does not sidestep the problem it seeks to avoid. At the end of the day, one must come face to face with the decision whether or not the state policy (with which a putatively procedural state rule may be "bound up") pertains to a "substantive right or remedy," *post*, at 19—that is, whether it is substance or procedure.[15] The more one explores the alternatives to

————————

The concurrence's concern would make more sense if many Federal Rules that effectively alter state-law rights "bound up with procedures" would survive under *Sibbach*. But as the concurrence concedes, *post*, at 11, n. 10, very few would do so. The possible existence of a few outlier instances does not prove *Sibbach*'s interpretation is absurd. Congress may well have accepted such anomalies as the price of a uniform system of federal procedure.

[14] The concurrence argues that its approach is no more "taxing" than ours because few if any Federal Rules that are "facially valid" under the Enabling Act will fail the concurrence's test. *Post*, at 11, and n. 10. But that conclusion will be reached only after federal courts have considered hundreds of state rules applying the concurrence's inscrutable standard.

[15] The concurrence insists that the task will be easier if courts can

*Sibbach*'s rule, the more its wisdom becomes apparent.

## D

We must acknowledge the reality that keeping the federal-court door open to class actions that cannot proceed in state court will produce forum shopping. That is unacceptable when it comes as the consequence of judge-made rules created to fill supposed "gaps" in positive federal law. See *Hanna*, 380 U. S., at 471–472. For where neither the Constitution, a treaty, nor a statute provides the rule of decision or authorizes a federal court to supply one, "state law must govern because there can be no other law." *Ibid.;* see Clark, *Erie's* Constitutional Source, 95 Cal. L. Rev. 1289, 1302, 1311 (2007). But divergence from state law, with the attendant consequence of forum shopping, is the inevitable (indeed, one might say the intended) result of a uniform system of federal procedure. Congress itself has created the possibility that the same case may follow a different course if filed in federal instead of state court. Cf. *Hanna*, 380 U. S., at 472–473. The short of the matter is that a Federal Rule governing procedure is valid whether or not it alters the outcome of the case in a way that induces forum shopping. To hold otherwise would be to "disembowel either the Constitution's grant of power over federal procedure" or Congress's exercise of it. *Id.*, at 473–474.

\*   \*   \*

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings.

*It is so ordered.*

_____

"conside[r] the nature and functions of the state law," *post*, at 11, n. 10, regardless of the law's "form," *post*, at 4 (emphasis deleted), *i.e.*, what the law actually says. We think that amorphous inquiry into the "nature and functions" of a state law will tend to increase, rather than decrease, the difficulty of classifying Federal Rules as substantive or procedural. Walking through the concurrence's application of its test to §901(b), *post*, at 17–22, gives little reason to hope that its approach will lighten the burden for lower courts.

# SUPREME COURT OF THE UNITED STATES

_____

No. 08–1008

_____

## SHADY GROVE ORTHOPEDIC ASSOCIATES, P. A., PETITIONER *v.* ALLSTATE INSURANCE COMPANY

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[March 31, 2010]

JUSTICE STEVENS, concurring in part and concurring in the judgment.

The New York law at issue, N. Y. Civ. Prac. Law Ann. (CPLR) §901(b) (West 2006), is a procedural rule that is not part of New York's substantive law. Accordingly, I agree with JUSTICE SCALIA that Federal Rule of Civil Procedure 23 must apply in this case and join Parts I and II–A of the Court's opinion. But I also agree with JUSTICE GINSBURG that there are some state procedural rules that federal courts must apply in diversity cases because they function as a part of the State's definition of substantive rights and remedies.

I

It is a long-recognized principle that federal courts sitting in diversity "apply state substantive law and federal procedural law." *Hanna* v. *Plumer*, 380 U. S. 460, 465 (1965).[1] This principle is governed by a statutory framework, and the way that it is administered varies depending upon whether there is a federal rule addressed to the

_____

[1] See also *Gasperini* v. *Center for Humanities, Inc.*, 518 U. S. 415, 427 (1996); E. Chemerinsky, Federal Jurisdiction §5.3, p. 327 (5th ed. 2007) (hereinafter Chemerinsky); 17A J. Moore et al., Moore's Federal Practice §124.01[1] (3d ed. 2009) (hereinafter Moore).

matter. See *id.*, at 469–472. If no federal rule applies, a federal court must follow the Rules of Decision Act, 28 U. S. C. §1652, and make the "relatively unguided *Erie* choice,"[2] *Hanna*, 380 U. S., at 471, to determine whether the state law is the "rule of decision." But when a situation is covered by a federal rule, the Rules of Decision Act inquiry by its own terms does not apply. See §1652; *Hanna*, 380 U. S., at 471. Instead, the Rules Enabling Act (Enabling Act) controls. See 28 U. S. C. §2072.

That does not mean, however, that the federal rule always governs. Congress has provided for a system of uniform federal rules, see *ibid.*, under which federal courts sitting in diversity operate as "an independent system for administering justice to litigants who properly invoke its jurisdiction," *Byrd* v. *Blue Ridge Rural Elec. Cooperative, Inc.*, 356 U. S. 525, 537 (1958), and not as state-court clones that assume all aspects of state tribunals but are managed by Article III judges. See *Hanna*, 380 U. S., at 473–474. But while Congress may have the constitutional power to prescribe procedural rules that interfere with state substantive law in any number of respects, that is not what Congress has done. Instead, it has provided in the Enabling Act that although "[t]he Supreme Court" may "prescribe general rules of practice and procedure," §2072(a), those rules "shall not abridge, enlarge or modify any substantive right," §2072(b). Therefore, "[w]hen a situation is covered by one of the Federal Rules, . . . the court has been instructed to apply the Federal Rule" unless doing so would violate the Act or the Constitution. *Hanna*, 380 U. S., at 471.

Although the Enabling Act and the Rules of Decision

─────────

[2] The *Erie* choice requires that the court consider "the twin aims of the *Erie* rule: discouragement of forum-shopping and avoidance of inequitable administration of the laws." *Hanna* v. *Plumer*, 380 U. S. 460, 468 (1965); see also *Gasperini*, 518 U. S., at 427–428 (describing *Erie* inquiry).

Act "say, roughly, that federal courts are to apply state 'substantive' law and federal 'procedural' law," the inquiries are not the same. *Ibid.;* see also *id.*, at 469–470. The Enabling Act does not invite federal courts to engage in the "relatively unguided *Erie* choice," *id.*, at 471, but instead instructs only that federal rules cannot "abridge, enlarge or modify any substantive right," §2072(b). The Enabling Act's limitation does not mean that federal rules cannot displace state policy judgments; it means only that federal rules cannot displace a State's definition of its own rights or remedies. See *Sibbach* v. *Wilson & Co.*, 312 U. S. 1, 13–14 (1941) (reasoning that "the phrase 'substantive rights'" embraces only those state rights that are sought to be enforced in the judicial proceedings).

Congress has thus struck a balance: "[H]ousekeeping rules for federal courts" will generally apply in diversity cases, notwithstanding that some federal rules "will inevitably differ" from state rules. *Hanna*, 380 U. S., at 473. But not every federal "rul[e] of practice or procedure," §2072(a), will displace state law. To the contrary, federal rules must be interpreted with some degree of "sensitivity to important state interests and regulatory policies," *Gasperini* v. *Center for Humanities, Inc.*, 518 U. S. 415, 427, n. 7 (1996), and applied to diversity cases against the background of Congress' command that such rules not alter substantive rights and with consideration of "the degree to which the Rule makes the character and result of the federal litigation stray from the course it would follow in state courts," *Hanna*, 380 U. S., at 473. This can be a tricky balance to implement.[3]

It is important to observe that the balance Congress

---

[3] See Chemerinsky §5.3, at 321 (observing that courts "have struggled to develop an approach that permits uniform procedural rules to be applied in federal court while still allowing state substantive law to govern").

has struck turns, in part, on the nature of the state law that is being displaced by a federal rule. And in my view, the application of that balance does not necessarily turn on whether the state law at issue takes the *form* of what is traditionally described as substantive or procedural. Rather, it turns on whether the state law actually is part of a State's framework of substantive rights or remedies. See §2072(b); cf. *Hanna,* 380 U. S., at 471 ("The line between 'substance' and 'procedure' shifts as the legal context changes"); *Guaranty Trust Co.* v. *York*, 326 U. S. 99, 108 (1945) (noting that the words " 'substance' " and " 'procedure' " "[e]ach impl[y] different variables depending upon the particular problem for which [they] are used").

Applying this balance, therefore, requires careful interpretation of the state and federal provisions at issue. "The line between procedural and substantive law is hazy," *Erie R. Co.* v. *Tompkins*, 304 U. S. 64, 92 (1938) (Reed, J., concurring), and matters of procedure and matters of substance are not "mutually exclusive categories with easily ascertainable contents," *Sibbach*, 312 U. S., at 17 (Frankfurter, J., dissenting). Rather, "[r]ules which lawyers call procedural do not always exhaust their effect by regulating procedure," *Cohen* v. *Beneficial Industrial Loan Corp.*, 337 U. S. 541, 555 (1949), and in some situations, "procedure and substance are so interwoven that rational separation becomes well-nigh impossible," *id.,* at 559 (Rutledge, J., dissenting). A "state procedural rule, though undeniably 'procedural' in the ordinary sense of the term," may exist "to influence substantive outcomes," *S. A. Healy Co.* v. *Milwaukee Metropolitan Sewerage Dist.,* 60 F. 3d 305, 310 (CA7 1995) (Posner, J.), and may in some instances become so bound up with the state-created right or remedy that it defines the scope of that substantive right or remedy. Such laws, for example, may be seemingly procedural rules that make it significantly more difficult to bring or to prove a claim, thus serving to limit

the scope of that claim. See, *e.g, Cohen*, 337 U. S., at 555 (state "procedure" that required plaintiffs to post bond before suing); *Guaranty Trust Co.*, 326 U. S. 99 (state statute of limitations).[4] Such "procedural rules" may also define the amount of recovery. See, *e.g., Gasperini*, 518 U. S., at 427 (state procedure for examining jury verdicts as means of capping the available remedy); Moore §124.07[3][a] (listing examples of federal courts' applying state laws that affect the amount of a judgment).

In our federalist system, Congress has not mandated that federal courts dictate to state legislatures the form that their substantive law must take. And were federal courts to ignore those portions of substantive state law that operate as procedural devices, it could in many instances limit the ways that sovereign States may define their rights and remedies. When a State chooses to use a traditionally procedural vehicle as a means of defining the scope of substantive rights or remedies, federal courts must recognize and respect that choice. Cf. *Ragan* v. *Merchants Transfer & Warehouse Co.*, 337 U. S. 530, 533 (1949) ("Since th[e] cause of action is created by local law, the measure of it is to be found only in local law. . . . Where local law qualifies or abridges it, the federal court must follow suit").

## II

When both a federal rule and a state law appear to govern a question before a federal court sitting in diver-

---

[4] Cf. *Milam* v. *State Farm Mut. Auto. Ins. Co.*, 972 F. 2d 166, 170 (CA7 1992) (Posner, J.) (holding that "where a state in furtherance of its substantive policy makes it more difficult to prove a particular type of state-law claim, the rule by which it does this, even if denominated a rule of evidence or cast in evidentiary terms, will be given effect in a diversity suit as an expression of state substantive policy"); Moore §124.09[2] (listing examples of federal courts that apply state evidentiary rules to diversity suits). Other examples include state-imposed burdens of proof.

sity, our precedents have set out a two-step framework for federal courts to negotiate this thorny area. At both steps of the inquiry, there is a critical question about what the state law and the federal rule mean.

The court must first determine whether the scope of the federal rule is "'sufficiently broad'" to "'control the issue'" before the court, "thereby leaving no room for the operation" of seemingly conflicting state law. See *Burlington Northern R. Co.* v. *Woods*, 480 U. S. 1, 4–5 (1987); *Walker* v. *Armco Steel Corp.*, 446 U. S. 740, 749–750, and n. 9 (1980). If the federal rule does not apply or can operate alongside the state rule, then there is no "Ac[t] of Congress" governing that particular question, 28 U. S. C. §1652, and the court must engage in the traditional Rules of Decision Act inquiry under *Erie* and its progeny. In some instances, the "plain meaning" of a federal rule will not come into "'direct collision'" with the state law, and both can operate. *Walker*, 446 U. S., at 750, n. 9, 749. In other instances, the rule "when fairly construed," *Burlington Northern R. Co.*, 480 U. S., at 4, with "sensitivity to important state interests and regulatory policies," *Gasperini*, 518 U. S., at 427, n. 7, will not collide with the state law.[5]

_____

[5] I thus agree with JUSTICE GINSBURG, *post*, at 3–7, that a federal rule, like any federal law, must be interpreted in light of many different considerations, including "sensitivity to important state interests," *post*, at 7, and "regulatory policies," *post*, at 2. See *Stewart Organization, Inc.* v. *Ricoh Corp.*, 487 U. S. 22, 37–38 (1988) (SCALIA, J., dissenting) ("We should assume . . . when it is fair to do so, that Congress is just as concerned as we have been to avoid significant differences between state and federal courts in adjudicating claims. . . . Thus, in deciding whether a federal . . . Rule of Procedure encompasses a particular issue, a broad reading that would create significant disuniformity between state and federal courts should be avoided if the text permits"). I disagree with JUSTICE GINSBURG, however, about the degree to which the meaning of federal rules may be contorted, absent congressional authorization to do so, to accommodate state policy goals.

If, on the other hand, the federal rule is "sufficiently broad to control the issue before the Court," such that there is a "direct collision," *Walker*, 446 U. S., at 749–750, the court must decide whether application of the federal rule "represents a valid exercise" of the "rulemaking authority . . . bestowed on this Court by the Rules Enabling Act." *Burlington Northern R. Co.*, 480 U. S., at 5; see also *Gasperini*, 518 U. S., at 427, n. 7; *Hanna*, 380 U. S., at 471–474. That Act requires, *inter alia*, that federal rules "not abridge, enlarge or modify *any* substantive right." 28 U. S. C. §2072(b) (emphasis added). Unlike JUSTICE SCALIA, I believe that an application of a federal rule that effectively abridges, enlarges, or modifies a state-created right or remedy violates this command. Congress may have the constitutional power "to supplant state law" with rules that are "rationally capable of classification as procedure," *ante*, at 12 (internal quotation marks omitted), but we should generally presume that it has not done so. Cf. *Wyeth* v. *Levine*, 555 U. S. \_\_\_, \_\_\_ (2009) (slip op., at 8) (observing that "we start with the assumption" that a federal statute does not displace a State's law "unless that was the clear and manifest purpose of Congress" (internal quotation marks omitted)). Indeed, the mandate that federal rules "shall not abridge, enlarge or modify any substantive right" evinces the opposite intent, as does Congress' decision to delegate the creation of rules to this Court rather than to a political branch, see 19 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure §4509, p. 265 (2d ed. 1996) (hereinafter Wright).

Thus, the second step of the inquiry may well bleed back into the first. When a federal rule appears to abridge, enlarge, or modify a substantive right, federal courts must consider whether the rule can reasonably be interpreted to avoid that impermissible result. See, *e.g.*, *Semtek Int'l Inc.* v. *Lockheed Martin Corp.*, 531 U. S. 497, 503 (2001) (avoiding an interpretation of Federal Rule of Civil Proce-

dure 41(b) that "would arguably violate the jurisdictional limitation of the Rules Enabling Act" contained in §2072(b)).[6]  And when such a "saving" construction is not possible and the rule would violate the Enabling Act, federal courts cannot apply the rule.   See 28 U. S. C. §2072(b) (mandating that federal rules "shall not" alter "*any* substantive right" (emphasis added)); *Hanna,* 380 U. S., at 473 ("[A] court, in measuring a Federal Rule against the standards contained in the Enabling Act . . . need not wholly blind itself to the degree to which the Rule makes the character and result of the federal litigation stray from the course it would follow in state courts"); see also *Semtek Int'l Inc.,* 531 U. S., at 503–504 (noting that if state law granted a particular right, "the federal court's extinguishment of that right. . . would seem to violate [§2072(b)]"); cf. Statement of Justices Black and Douglas*,* 374 U. S. 865, 870 (1963) (observing that federal rules "as applied in given situations might have to be declared invalid").   A federal rule, therefore, cannot govern a particular case in which the rule would displace a state law that is procedural in the ordinary use of the term but is so intertwined with a state right or remedy that it functions to define the scope of the state-created right.   And absent a governing federal rule, a federal court must engage in the traditional Rules of Decision Act inquiry, under the *Erie* line of cases.   This application of the Enabling Act shows "sensitivity to important state interests," *post,* at 7, and "regulatory policies," *post*, at 2, but it does so as Congress authorized, by ensuring that federal rules that

––––––––––––

[6] See also *Ortiz* v. *Fibreboard Corp.*, 527 U. S. 815, 842, 845 (1999) (adopting "limiting construction" of Federal Rule of Civil Procedure 23 that, *inter alia*, "minimizes potential conflict with the Rules Enabling Act"); *Amchem Products, Inc.* v. *Windsor*, 521 U. S. 591, 612–613 (1997) (observing that federal rules "must be interpreted in keeping with the Rules Enabling Act, which instructs that rules of procedure 'shall not abridge, enlarge or modify any substantive right'").

ordinarily "prescribe general rules of practice and procedure," §2072(a), do "not abridge, enlarge or modify any substantive right," §2072(b).

JUSTICE SCALIA believes that the sole Enabling Act question is whether the federal rule "really regulates procedure," *ante*, at 12, 16, 17, 20, n. 13 (plurality opinion) (internal quotation marks omitted), which means, apparently, whether it regulates "the manner and the means by which the litigants' rights are enforced," *ante*, at 13 (internal quotation marks omitted). I respectfully disagree.[7] This interpretation of the Enabling Act is consonant with the Act's first limitation to "general rules of practice and procedure," §2072(a). But it ignores the second limitation that such rules also "not abridge, enlarge or modify *any* substantive right," §2072(b) (emphasis added),[8] and in so

_____

[7] This understanding of the Enabling Act has been the subject of substantial academic criticism, and rightfully so. See, *e.g.*, Wright §4509, at 264, 269–270, 272; Ely, The Irrepressible Myth of Erie, 87 Harv. L. Rev. 693, 719 (1974) (hereinafter Ely); see also R. Fallon, J. Manning, D. Meltzer, & D. Shapiro, Hart and Wechsler's, The Federal Courts and the Federal System 593, n. 6 (6th ed. 2009) (discussing Ely).

[8] JUSTICE SCALIA concedes as much, see *ante*, at 18–19, but argues that insofar as I allow for the possibility that a federal rule might violate the Enabling Act when it displaces a seemingly procedural state rule, my approach is itself "unfaithful to the statute's terms," which cover "substantive rights" but not "procedural rules," *ante*, at 19, n. 11 (internal quotation marks omitted). This is not an objection to my interpretation of the Enabling Act—that courts must look to whether a federal rule alters substantive rights in a given case—but simply to the way I would apply it, allowing for the possibility that a state rule that regulates something traditionally considered to be procedural might actually define a substantive right. JUSTICE SCALIA's objection, moreover, misses the key point: In some instances, a state rule that appears procedural really is not. A rule about how damages are reviewed on appeal may really be a damages cap. See *Gasperini*, 518 U. S., at 427. A rule that a plaintiff can bring a claim for only three years may really be a limit on the existence of the right to seek redress. A rule that a claim must be proved beyond a reasonable doubt may really be a definition of the scope of the claim. These are the sorts of rules that

doing ignores the balance that Congress struck between
uniform rules of federal procedure and respect for a State's
construction of its own rights and remedies. It also ig-
nores the separation-of-powers presumption, see Wright
§4509, at 265, and federalism presumption, see *Wyeth*, 555
U. S., at ___ (slip op., at 8), that counsel against judicially
created rules displacing state substantive law.[9]

––––––––––

one might describe as "procedural," but they nonetheless define sub-
stantive rights. Thus, if a federal rule displaced such a state rule, the
federal rule would have altered the State's "substantive rights."

[9] The plurality's interpretation of the Enabling Act appears to mean
that no matter how bound up a state provision is with the State's own
rights or remedies, any contrary federal rule that happens to regulate
"the manner and the means by which the litigants' rights are enforced,"
*ante*, at 13 (internal quotation marks omitted), must govern. There are
many ways in which seemingly procedural rules may displace a State's
formulation of its substantive law. For example, statutes of limitations,
although in some sense procedural rules, can also be understood as a
temporal limitation on legally created rights; if this Court were to
promulgate a federal limitations period, federal courts would still, in
some instances, be required to apply state limitations periods. Simi-
larly, if the federal rules altered the burden of proof in a case, this could
eviscerate a critical aspect—albeit one that deals with *how* a right is
enforced—of a State's framework of rights and remedies. Or if a federal
rule about appellate review displaced a state rule about how damages
are reviewed on appeal, the federal rule might be pre-empting a state
damages cap. Cf. *Gasperini*, 518 U. S., at 427.

   JUSTICE SCALIA responds that some of these federal rules might be
invalid under his view of the Enabling Act because they may not "really
regulat[e] procedure." *Ante*, at 20, n. 13 (internal quotation marks
omitted). This response, of course, highlights how empty the plurality's
test really is. See n. 10, *infra*. The response is also limited to those
rules that can be described as "regulat[ing]" substance, *ante*, at 13; it
does not address those federal rules that alter the right at issue in the
litigation, see *Sibbach* v. *Wilson & Co.*, 312 U. S. 1, 13–14 (1941), only
when they displace particular state laws. JUSTICE SCALIA speculates
that "Congress may well have accepted" the occasional alteration of
substantive rights "as the price of a uniform system of federal proce-
dure." *Ante*, at 20–21, n. 13. Were we forced to speculate about the
balance that Congress struck, I might very well agree. But no specula-
tion is necessary because Congress explicitly told us that federal rules

Although the plurality appears to agree with much of my interpretation of §2072, see *ante*, at 18–19, it nonetheless rejects that approach for two reasons, both of which are mistaken. First, JUSTICE SCALIA worries that if federal courts inquire into the effect of federal rules on state law, it will enmesh federal courts in difficult determinations about whether application of a given rule would displace a state determination about substantive rights. See *ante*, at 15, 21–22, and nn. 14, 15. I do not see why an Enabling Act inquiry that looks to state law necessarily is more taxing than JUSTICE SCALIA's.[10] But in any event, that inquiry is what the Enabling Act requires: While it may not be easy to decide what is actually a "substantive right," "the designations substantive and procedural become important, for the Enabling Act has made them so." Ely 723; see also Wright §4509, at 266. The question, therefore, is not what rule *we* think would be easiest on federal courts. The question is what rule Congress established. Although, JUSTICE SCALIA may generally prefer easily administrable, bright-line rules, his preference does not give us license to adopt a second-best interpretation of the Rules Enabling Act. Courts cannot ignore text and

———————

"shall not" alter "any" substantive right. §2072(b).

[10] It will be rare that a federal rule that is facially valid under 28 U. S. C. §2072 will displace a State's definition of its own substantive rights. See Wright §4509, at 272 (observing that "unusual cases occasionally might arise in which . . . because of an unorthodox state rule of law, application of a Civil Rule . . . would intrude upon state substantive rights"). JUSTICE SCALIA's interpretation, moreover, is not much more determinative than mine. Although it avoids courts' having to evaluate state law, it tasks them with figuring out whether a federal rule is really "procedural." It is hard to know the answer to that question and especially hard to resolve it without considering the nature and functions of the state law that the federal rule will displace. The plurality's "'test' is no test at all—in a sense, it is little more than the statement that a matter is procedural if, by revelation, it is procedural." *Id.*, §4509, at 264.

context in the service of simplicity.

Second, the plurality argues that its interpretation of the Enabling Act is dictated by this Court's decision in *Sibbach*, which applied a Federal Rule about when parties must submit to medical examinations. But the plurality misreads that opinion. As Justice Harlan observed in *Hanna*, "shorthand formulations which have appeared in earlier opinions are prone to carry untoward results that frequently arise from oversimplification." 380 U. S., at 475 (concurring opinion). To understand *Sibbach*, it is first necessary to understand the issue that was before the Court. The petitioner raised only the facial question whether "Rules 35 and 37 [of the Federal Rules of Civil Procedure] are . . . within the mandate of Congress to this court" and not the specific question of "the obligation of federal courts to apply the substantive law of a state."[11] 312 U. S., at 9. The Court, therefore, had no occasion to consider whether the particular application of the Federal Rules in question would offend the Enabling Act.[12]

---

[11] The petitioner in *Sibbach* argued only that federal rules could not validly address subjects involving "important questions of policy," Supp. Brief of Petitioner, O. T. 1940, No. 28, p. 7; see also Reply to Brief of Respondent, O. T. 1940, No. 28, p. 2 (summarizing that the petitioner argued only that "[t]he right not to be compelled to submit to a physical examination" is "a 'substantive' right forbidden by Congress" to be addressed by the Federal Rules of Civil Procedure, "even though in theory the right is not of the character determinative of litigation"). In the petitioner's own words, "[t]his contention. . . [did] not in itself involve the [applicable] law of Illinois," *ibid.*, and the petitioner in her briefing referenced the otherwise applicable state law only "to show that [she] was in a position to make the contention," *ibid.*, that is, to show that the federal court was applying a federal rule and not, under the Rules of Decision Act, applying state law, see *id.*, at 3.

[12] The plurality defends its view by including a long quote from two paragraphs of *Sibbach*. *Ante*, at 15–16. But the quoted passage of *Sibbach* describes only a facial inquiry into whether federal rules may "deal with" particular subject matter. 312 U. S., at 13. The plurality's block quote, moreover, omits half of one of the quoted paragraphs, in

Opinion of STEVENS, J.

Nor, in *Sibbach*, was any further analysis necessary to the resolution of the case because the matter at issue, requiring medical exams for litigants, did not pertain to "substantive rights" under the Enabling Act. Although most state rules bearing on the litigation process are adopted for some policy reason, few seemingly "procedural" rules define the scope of a substantive right or remedy. The matter at issue in *Sibbach* reflected competing federal and state judgments about privacy interests. Those privacy concerns may have been weighty and in some sense substantive; but they did not pertain to the scope of any state right or remedy at issue in the litigation. Thus, in response to the petitioner's argument in *Sibbach* that "substantive rights" include not only "rights sought to be adjudicated by the litigants" but also "general principle[s]" or "question[s] of public policy that the legislature is able to pass upon," *id.*, at 2–3, we held that "the phrase 'substantive rights'" embraces only state rights, such as the tort law in that case, that are sought to be enforced in the judicial proceedings. *Id.*, at 13–14. If the Federal Rule had in fact displaced a state rule that was sufficiently intertwined with a state right or remedy, then perhaps the Enabling Act analysis would have been different.[13] Our subsequent cases are not to the contrary.[14]

─────────

which the Court explained that the term "substantive rights" in the Enabling Act "certainly embraces such rights" as "rights conferred by law to be protected and enforced," such as "the right not to be injured in one's person by another's negligence" and "to redress [such] infraction." *Ibid*. But whether a federal rule, for example, enlarges the right "to redress [an] infraction," will depend on the state law that it displaces.

[13] Put another way, even if a federal rule in most cases "really regulates procedure," *Sibbach*, 312 U. S., at 14, it does not "really regulat[e] procedure" when it displaces those rare state rules that, although "procedural" in the ordinary sense of the term, operate to define the rights and remedies available in a case. This is so because what is procedural in one context may be substantive in another. See *Hanna*, 380 U. S., at 471; *Guaranty Trust Co.* v. *York*, 326 U. S. 99, 108 (1945).

[14] Although this Court's decision in *Hanna* cited *Sibbach*, that is of

14　　SHADY GROVE ORTHOPEDIC ASSOCIATES, P. A.
*v.* ALLSTATE INS. CO.

Opinion of STEVENS, J.

### III

JUSTICE GINSBURG views the basic issue in this case as whether and how to apply a federal rule that dictates an answer to a traditionally procedural question (whether to join plaintiffs together as a class), when a state law that "defines the dimensions" of a state-created claim dictates the opposite answer. *Post,* at 12. As explained above, I readily acknowledge that if a federal rule displaces a state rule that is "'procedural' in the ordinary sense of the term," *S. A. Healy Co.*, 60 F. 3d, at 310, but sufficiently interwoven with the scope of a substantive right or remedy, there would be an Enabling Act problem, and the federal rule would have to give way. In my view, however,

---

little significance. *Hanna* did not hold that any seemingly procedural federal rule will always govern, even when it alters a substantive state right; nor, as in *Sibbach*, was the argument that I now make before the Court. Indeed, in *Hanna* we cited *Sibbach*'s statement that the Enabling Act prohibits federal rules that alter the rights to be adjudicated by the litigants, 312 U. S., at 13–14, for the proposition that "a court, in measuring a Federal Rule against the standards contained in the Enabling Act . . . need not wholly blind itself to the degree to which the Rule makes the character and result of the federal litigation stray from the course it would follow in state courts," 380 U. S., at 473. And most of our subsequent decisions that have squarely addressed the framework for applying federal rules in diversity cases have not mentioned *Sibbach* at all but cited only *Hanna*. See, *e.g.*, *Burlington Northern R. Co.* v. *Woods*, 480 U. S. 1, 5 (1987).

JUSTICE SCALIA notes that in *Mississippi Publishing Corp.* v. *Murphree*, 326 U. S. 438 (1946), we used language that supported his view. See *ante*, at 13. But in that case, we contemplated only that the Federal Rule in question might have "incidental effects . . . upon the rights of litigants," explaining that "[t]he fact that the application of Rule 4(f) will operate to subject petitioner's rights to adjudication by the district court for northern Mississippi" rather than southern Mississippi "will undoubtedly affect those rights." 326 U. S., at 445–446. There was no suggestion that by affecting the method of enforcing the rights in that case, the federal rules could plausibly abridge, enlarge, or modify the rights themselves.

this is not such a case.

*Rule 23 Controls Class Certification*

When the District Court in the case before us was asked to certify a class action, Federal Rule of Civil Procedure 23 squarely governed the determination whether the court should do so. That is the explicit function of Rule 23. Rule 23, therefore, must apply unless its application would abridge, enlarge, or modify New York rights or remedies.

Notwithstanding the plain language of Rule 23, I understand the dissent to find that Rule 23 does *not* govern the question of class certification in this matter because New York has made a substantive judgment that such a class should not be certified, as a means of proscribing damages. Although, as discussed *infra*, at 17–20, I do not accept the dissent's view of §901(b), I also do not see how the dissent's interpretation of Rule 23 follows from that view.[15] I

―――――――

[15] Nor do I see how it follows from the dissent's premises that a class cannot be certified. The dissent contends that §901(b) is a damages "limitation," *post*, at 7, n. 2, 8, 9, 12, 25, or "proscription," *post*, at 12, n. 6, 21, whereas Rule 23 "does not command that a particular remedy be available when a party sues in a representative capacity," *post*, at 11, and that consequently both provisions can apply. Yet even if the dissent's premises were correct, Rule 23 would still control the question whether petitioner may certify a class, and §901(b) would be relevant only to determine whether petitioner, at the conclusion of a class-action lawsuit, may collect statutory damages.

It may be that if the dissent's interpretation of §901(b) were correct, this class could not (or has not) alleged sufficient damages for the federal court to have jurisdiction, see 28 U. S. C. §1332(d)(6). But that issue was not raised in respondent's motion to dismiss (from which the case comes to this Court), and it was not squarely presented to the Court. In any event, although the lead plaintiff has "acknowledged that its individual claim" is for less than the required amount in controversy, see 549 F. 3d 137, 140 (CA2 2008), we do not know what actual damages the entire class can allege. Thus, even if the Court were to adopt all of the dissent's premises, I believe the correct disposition would be to vacate and remand for further consideration of whether the required amount in controversy has or can be met.

agree with JUSTICE GINSBURG that courts should "avoi[d] immoderate interpretations of the Federal Rules that would trench on state prerogatives," *post*, at 3–4, and should in some instances "interpre[t] the federal rules to avoid conflict with important state regulatory policies," *post*, at 5 (internal quotation marks omitted). But that is not what the dissent has done. Simply because a rule should be read in light of federalism concerns, it does not follow that courts may rewrite the rule.

At bottom, the dissent's interpretation of Rule 23 seems to be that Rule 23 covers only those cases in which its application would create no *Erie* problem. The dissent would apply the Rules of Decision Act inquiry under *Erie* even to cases in which there is a governing federal rule, and thus the Act, by its own terms, does not apply. But "[w]hen a situation is covered by one of the Federal Rules, the question facing the court is a far cry from the typical, relatively unguided *Erie* choice." *Hanna*, 380 U. S., at 471. The question is only whether the Enabling Act is satisfied. Although it reflects a laudable concern to protect "state regulatory policies," *post*, at 5 (internal quotation marks omitted), JUSTICE GINSBURG's approach would, in my view, work an end run around Congress' system of uniform federal rules, see 28 U. S. C. §2072, and our decision in *Hanna*. Federal courts can and should interpret federal rules with sensitivity to "state prerogatives," *post*, at 4; but even when "state interests . . . warrant our respectful consideration," *post*, at 8, federal courts cannot rewrite the rules. If my dissenting colleagues feel strongly that §901(b) is substantive and that class certification should be denied, then they should argue within the Enabling Act's framework. Otherwise, "the Federal Rule applies regardless of contrary state law." *Gasperini*, 518 U. S., at 427, n. 7; accord, *Hanna*, 380 U. S., at 471.

*Applying Rule 23 Does Not Violate the Enabling Act*

As I have explained, in considering whether to certify a class action such as this one, a federal court must inquire whether doing so would abridge, enlarge, or modify New York's rights or remedies, and thereby violate the Enabling Act. This inquiry is not always a simple one because "[i]t is difficult to conceive of any rule of procedure that cannot have a significant effect on the outcome of a case," Wright §4508, at 232–233, and almost "any rule can be said to have . . . 'substantive effects,' affecting society's distribution of risks and rewards," Ely 724, n. 170. Faced with a federal rule that dictates an answer to a traditionally procedural question and that displaces a state rule, one can often argue that the state rule was *really* some part of the State's definition of its rights or remedies.

In my view, however, the bar for finding an Enabling Act problem is a high one. The mere fact that a state law is designed as a procedural rule suggests it reflects a judgment about how state courts ought to operate and not a judgment about the scope of state-created rights and remedies. And for the purposes of operating a federal court system, there are costs involved in attempting to discover the true nature of a state procedural rule and allowing such a rule to operate alongside a federal rule that appears to govern the same question. The mere possibility that a federal rule would alter a state-created right is not sufficient. There must be little doubt.

The text of CPLR §901(b) expressly and unambiguously applies not only to claims based on New York law but also to claims based on federal law or the law of any other State. And there is no interpretation from New York courts to the contrary. It is therefore hard to see how §901(b) could be understood as a rule that, though procedural in form, serves the function of defining New York's rights or remedies. This is all the more apparent because lawsuits under New York law could be joined in federal class actions well before New York passed §901(b) in 1975,

and New York had done nothing to prevent that. It is true, as the dissent points out, that there is a limited amount of legislative history that can be read to suggest that the New York officials who supported §901(b) wished to create a "limitation" on New York's "statutory damages." *Post*, at 8. But, as JUSTICE SCALIA notes, that is not the law that New York adopted.[16] See *ante*, at 7–8 (opinion of the Court).

The legislative history, moreover, does not clearly describe a judgment that §901(b) would operate as a limitation on New York's statutory damages. In evaluating that

---

[16] In its *Erie* analysis, the dissent observes that when sovereigns create laws, the enacting legislatures sometimes assume those laws will apply only within their territory. See *post*, at 18–20. That is a true fact, but it does not do very much work for the dissent's position. For one thing, as the dissent observes, this *Erie* analysis is relevant only if there is no conflict between Rule 23 and §901(b), and the court can thus apply both. *Post*, at 17. But because, in my view, Rule 23 applies, the only question is whether it would violate the Enabling Act. See *Hanna*, 380 U. S., at 471. And that inquiry is different from the Rules of Decision Act, or *Erie*, inquiry. See *id.*, at 469–471.

The dissent's citations, moreover, highlight simply that when interpreting statutes, context matters. Thus, we sometimes presume that laws cover only domestic conduct and sometimes do not, depending upon, *inter alia*, whether it makes sense in a given situation to assume that "the character of an act as lawful or unlawful must be determined wholly by the law of the [place] where the act is done," *American Banana Co.* v. *United Fruit Co.*, 213 U. S. 347, 356 (1909). But in the context of §901(b), a presumption against extraterritoriality makes little sense. That presumption applies almost only to laws governing what people can or cannot do. Section 901(b), however, is not directed to the conduct of persons but is instead directed to New York courts. Thus, §901(b) is, by its own terms, not extraterritorial insofar as it states that it governs *New York* courts. It is possible that the New York Legislature simply did not realize that New York courts hear claims under other sources of law and that other courts hear claims under New York law, and therefore mistakenly believed that they had written a limit on New York remedies. But because New York set up §901(b) as a general rule about how its courts operate, my strong presumption is to the contrary.

legislative history, it is necessary to distinguish between procedural rules adopted for *some* policy reason and seemingly procedural rules that are intimately bound up in the scope of a substantive right or remedy. Although almost every rule is adopted for some reason and has some effect on the outcome of litigation, not every state rule "defines the dimensions of [a] claim itself," *post*, at 12. New York clearly crafted §901(b) with the intent that only certain lawsuits—those for which there were not statutory penalties—could be joined in class actions in New York courts. That decision reflects a policy judgment about which lawsuits should proceed in New York courts in a class form and which should not. As JUSTICE GINSBURG carefully outlines, see *post*, at 8–10, §901(b) was "apparently" adopted in response to fears that the class-action procedure, applied to statutory penalties, would lead to "annihilating punishment of the defendant." V. Alexander, Practice Commentaries, C901:11, reprinted in 7B McKinney's Consolidated Laws of New York Ann., p. 104 (2006) (internal quotation marks omitted); see also *Sperry* v. *Crompton Corp.*, 8 N. Y. 3d 204, 211, 863 N. E. 2d 1012, 1015 (2007). But statements such as these are not particularly strong evidence that §901(b) serves to define who can obtain a statutory penalty or that certifying such a class would enlarge New York's remedy. Any device that makes litigation easier makes it easier for plaintiffs to recover damages.

In addition to the fear of excessive recoveries, some opponents of a broad class-action device "argued that there was no *need* to permit class actions in order to encourage litigation . . . when statutory penalties . . . provided an aggrieved party with a sufficient economic incentive to pursue a claim." *Id.*, at 211, 863 N. E. 2d, at 1015 (emphasis added). But those opponents may have felt merely that, for any number of reasons, New York courts should not conduct trials in the class format when that format is

unnecessary to motivate litigation.[17]   JUSTICE GINSBURG
asserts that this could not be true because "suits seeking
statutory damages are arguably *best* suited to the class
device because individual proof of actual damages is un-
necessary." *Post*, at 9–10.  But some people believe that
class actions are inefficient or at least unfair, insofar as
they join together slightly disparate claims or force courts
to adjudicate unwieldy lawsuits.  It is not for us to dismiss
the possibility that New York legislators shared in those
beliefs and thus wanted to exclude the class vehicle when
it appeared to be unnecessary.

The legislative history of §901 thus reveals a classically
procedural calibration of making it easier to litigate claims
in New York courts (under any source of law) only when it
is necessary to do so, and not making it *too* easy when the
class tool is not required.  This is the same sort of calcula-
tion that might go into setting filing fees or deadlines for
briefs.  There is of course a difference of degree between
those examples and class certification, but not a difference
of kind; the class vehicle may have a greater practical
effect on who brings lawsuits than do low filing fees, but
that does not transform it into a damages "proscription,"
*post*, at 12, n. 6, 21, or "limitation," *post*, at 7, n. 2, 8, 9, 12,
25.[18]

——————

[17] To be sure, one could imagine the converse story, that a legislature
would create statutory penalties but dictate that such penalties apply
only when necessary to overcome the costs and inconvenience of filing a
lawsuit, and thus are not necessary in a class action.  But it is hard to
see how that narrative applies to New York, given that New York's
penalty provisions, on their face, apply to all plaintiffs, be they class or
individual, and that §901(b) addresses penalties that are created under
any source of state or federal law.

[18] JUSTICE GINSBURG asserts that class certification in this matter
would "transform a $500 case into a $5,000,000 award." *Post*, at 1.  But
in fact, class certification would transform 10,000 $500 cases into one
$5,000,000 case.  It may be that without class certification, not all of
the potential plaintiffs would bring their cases.  But that is true of any

The difference of degree is relevant to the forum shopping considerations that are part of the Rules of Decision Act or *Erie* inquiry. If the applicable federal rule did not govern the particular question at issue (or could be fairly read not to do so), then those considerations would matter, for precisely the reasons given by the dissent. See *post*, at 17–24. But that is not *this* case. As the Court explained in *Hanna*, it is an "incorrect assumption that the rule of *Erie R. Co.* v. *Thompkins* constitutes the appropriate test of . . . the applicability of a Federal Rule of Civil Procedure." 380 U. S., at 469–470. "It is true that both the Enabling Act and the *Erie* rule say, roughly, that federal courts are to apply state 'substantive' law and federal 'procedural' law," but the tests are different and reflect the fact that "they were designed to control very different sorts of decisions." *Id.*, at 471.

Because Rule 23 governs class certification, the only decision is whether certifying a class in this diversity case would "abridge, enlarge or modify" New York's substantive rights or remedies. §2072(b). Although one can argue that class certification would enlarge New York's "limited" damages remedy, see *post*, at 7, n. 2, 8, 9, 12, 25, such arguments rest on extensive speculation about what the New York Legislature had in mind when it created §901(b). But given that there are two plausible competing narratives, it seems obvious to me that we should respect the plain textual reading of §901(b), a rule in New York's procedural code about when to certify class actions brought under any source of law, and respect Congress' decision that Rule 23 governs class certification in federal courts. In order to displace a federal rule, there must be more than just a possibility that the state rule is different

procedural vehicle; without a lower filing fee, a conveniently located courthouse, easy-to-use federal procedural rules, or many other features of the federal courts, many plaintiffs would not sue.

than it appears.

Accordingly, I concur in part and concur in the judgment.

# SUPREME COURT OF THE UNITED STATES

No. 08–1008

SHADY GROVE ORTHOPEDIC ASSOCIATES, P. A.,
PETITIONER *v.* ALLSTATE INSURANCE
COMPANY

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[March 31, 2010]

JUSTICE GINSBURG, with whom JUSTICE KENNEDY, JUSTICE BREYER, and JUSTICE ALITO join, dissenting.

The Court today approves Shady Grove's attempt to transform a $500 case into a $5,000,000 award, although the State creating the right to recover has proscribed this alchemy. If Shady Grove had filed suit in New York state court, the 2% interest payment authorized by New York Ins. Law Ann. §5106(a) (West 2009) as a penalty for overdue benefits would, by Shady Grove's own measure, amount to no more than $500. By instead filing in federal court based on the parties' diverse citizenship and requesting class certification, Shady Grove hopes to recover, for the class, statutory damages of more than $5,000,000. The New York Legislature has barred this remedy, instructing that, unless specifically permitted, "an action to recover a penalty, or minimum measure of recovery created or imposed by statute may not be maintained as a class action." N. Y. Civ. Prac. Law Ann. (CPLR) §901(b) (West 2006). The Court nevertheless holds that Federal Rule of Civil Procedure 23, which prescribes procedures for the conduct of class actions in federal courts, preempts the application of §901(b) in diversity suits.

The Court reads Rule 23 relentlessly to override New York's restriction on the availability of statutory damages.

Our decisions, however, caution us to ask, before under-
mining state legislation: Is this conflict really necessary?
Cf. Traynor, Is This Conflict Really Necessary? 37 Tex.
L. Rev. 657 (1959).   Had the Court engaged in that in-
quiry, it would not have read Rule 23 to collide with New
York's legitimate interest in keeping certain monetary
awards reasonably bounded.   I would continue to interpret
Federal Rules with awareness of, and sensitivity to, im-
portant state regulatory policies.   Because today's judg-
ment radically departs from that course, I dissent.

## I

## A

  "Under the *Erie* doctrine," it is long settled, "federal
courts sitting in diversity apply state substantive law and
federal procedural law."  *Gasperini* v. *Center for Humani-
ties, Inc.*, 518 U. S. 415, 427 (1996); see *Erie R. Co.* v.
*Tompkins,* 304 U. S. 64 (1938).   Justice Harlan aptly
conveyed the importance of the doctrine; he described *Erie*
as "one of the modern cornerstones of our federalism,
expressing policies that profoundly touch the allocation of
judicial power between the state and federal systems."
*Hanna* v. *Plumer*, 380 U. S. 460, 474 (1965) (concurring
opinion).    Although we have found *Erie*'s application
"sometimes [to be] a challenging endeavor," *Gasperini*, 518
U. S., at 427, two federal statutes mark our way.
  The first, the Rules of Decision Act,[1] prohibits federal
courts from generating substantive law in diversity ac-
tions.   See *Erie*, 304 U. S., at 78.   Originally enacted as
part of the Judiciary Act of 1789, this restraint serves a
policy of prime importance to our federal system.   We have

---

  [1] The Rules of Decision Act directs that, "[t]he laws of the several
states, except where the Constitution or treaties of the United States or
Acts of Congress otherwise require or provide, shall be regarded as
rules of decision in civil actions in the courts of the United States, in
cases where they apply."  28 U. S. C. §1652.

therefore applied the Act "with an eye alert to . . . avoiding disregard of State law." *Guaranty Trust Co.* v. *York*, 326 U. S. 99, 110 (1945).

The second, the Rules Enabling Act, enacted in 1934, authorizes us to "prescribe general rules of practice and procedure" for the federal courts, but with a crucial restriction: "Such rules shall not abridge, enlarge or modify any substantive right."  28 U. S. C. §2072.  Pursuant to this statute, we have adopted the Federal Rules of Civil Procedure.  In interpreting the scope of the Rules, including, in particular, Rule 23, we have been mindful of the limits on our authority.  See, *e.g., Ortiz* v. *Fibreboard Corp.*, 527 U. S. 815, 845 (1999) (The Rules Enabling Act counsels against "adventurous application" of Rule 23; any tension with the Act "is best kept within tolerable limits."); *Amchem Products, Inc.* v. *Windsor*, 521 U. S. 591, 612–613 (1997).  See also *Semtek Int'l Inc.* v. *Lockheed Martin Corp.*, 531 U. S. 497, 503–504 (2001).

If a Federal Rule controls an issue and directly conflicts with state law, the Rule, so long as it is consonant with the Rules Enabling Act, applies in diversity suits.  See *Hanna*, 380 U. S., at 469–474.  If, however, no Federal Rule or statute governs the issue, the Rules of Decision Act, as interpreted in *Erie*, controls.  That Act directs federal courts, in diversity cases, to apply state law when failure to do so would invite forum-shopping and yield markedly disparate litigation outcomes.  See *Gasperini*, 518 U. S., at 428; *Hanna*, 380 U. S., at 468.  Recognizing that the Rules of Decision Act and the Rules Enabling Act simultaneously frame and inform the *Erie* analysis, we have endeavored in diversity suits to remain safely within the bounds of both congressional directives.

B

In our prior decisions in point, many of them not mentioned in the Court's opinion, we have avoided immoderate

interpretations of the Federal Rules that would trench on state prerogatives without serving any countervailing federal interest. "Application of the *Hanna* analysis," we have said, "is premised on a 'direct collision' between the Federal Rule and the state law." *Walker* v. *Armco Steel Corp.*, 446 U. S. 740, 749–750 (1980) (quoting *Hanna*, 380 U. S., at 472). To displace state law, a Federal Rule, "when fairly construed," must be "'sufficiently broad'" so as "to 'control the issue' before the court, thereby leaving *no room* for the operation of that law." *Burlington Northern R. Co.* v. *Woods*, 480 U. S. 1, 4–5 (1987) (quoting *Walker*, 446 U. S., at 749–750, and n. 9; emphasis added); cf. *Stewart Organization, Inc.* v. *Ricoh Corp.*, 487 U. S. 22, 37–38 (1988) (SCALIA, J., dissenting) ("[I]n deciding whether a federal . . . Rule of Procedure encompasses a particular issue, a broad reading that would create significant disuniformity between state and federal courts should be avoided if the text permits.").

In pre-*Hanna* decisions, the Court vigilantly read the Federal Rules to avoid conflict with state laws. In *Palmer* v. *Hoffman*, 318 U. S. 109, 117 (1943), for example, the Court read Federal Rule 8(c), which lists affirmative defenses, to control only the manner of pleading the listed defenses in diversity cases; as to the burden of proof in such cases, *Palmer* held, state law controls.

Six years later, in *Ragan* v. *Merchants Transfer & Warehouse Co.*, 337 U. S. 530 (1949), the Court ruled that state law determines when a diversity suit commences for purposes of tolling the state limitations period. Although Federal Rule 3 specified that "[a] civil action is commenced by filing a complaint with the court," we held that the Rule did not displace a state law that tied an action's commencement to service of the summons. *Id.*, at 531–533. The "cause of action [wa]s created by local law," the Court explained, therefore "the measure of it [wa]s to be found only in local law." *Id.*, at 533.

Similarly in *Cohen* v. *Beneficial Industrial Loan Corp.*, 337 U. S. 541 (1949), the Court held applicable in a diversity action a state statute requiring plaintiffs, as a prerequisite to pursuit of a stockholder's derivative action, to post a bond as security for costs. At the time of the litigation, Rule 23, now Rule 23.1, addressed a plaintiff's institution of a derivative action in federal court. Although the Federal Rule specified prerequisites to a stockholder's maintenance of a derivative action, the Court found no conflict between the Rule and the state statute in question; the requirements of both could be enforced, the Court observed. See *id.*, at 556. Burdensome as the security-for-costs requirement may be, *Cohen* made plain, suitors could not escape the upfront outlay by resorting to the federal court's diversity jurisdiction.

In all of these cases, the Court stated in *Hanna*, "the scope of the Federal Rule was not as broad as the losing party urged, and therefore, there being no Federal Rule which covered the point in dispute, *Erie* commanded the enforcement of state law." 380 U. S., at 470. In *Hanna* itself, the Court found the clash "unavoidable," *ibid.*; the petitioner had effected service of process as prescribed by Federal Rule 4(d)(1), but that "how-to" method did not satisfy the special Massachusetts law applicable to service on an executor or administrator. Even as it rejected the Massachusetts prescription in favor of the federal procedure, however, "[t]he majority in Hanna recognized . . . that federal rules . . . must be interpreted by the courts applying them, and that the process of interpretation can and should reflect an awareness of legitimate state interests." R. Fallon, J. Manning, D. Meltzer, & D. Shapiro, Hart and Wechsler's The Federal Courts and the Federal System 593 (6th ed. 2009) (hereinafter Hart & Wechsler).

Following *Hanna*, we continued to "interpre[t] the federal rules to avoid conflict with important state regulatory policies." Hart & Wechsler 593. In *Walker*, the Court took

up the question whether *Ragan* should be overruled; we held, once again, that Federal Rule 3 does not directly conflict with state rules governing the time when an action commences for purposes of tolling a limitations period. 446 U. S., at 749–752. Rule 3, we said, addresses only "the date from which various timing requirements of the Federal Rules begin to run," *id.,* at 751, and does not "purpor[t] to displace state tolling rules," *id.,* at 750–751. Significant state policy interests would be frustrated, we observed, were we to read Rule 3 as superseding the state rule, which required actual service on the defendant to stop the clock on the statute of limitations. *Id.*, at 750–752.

We were similarly attentive to a State's regulatory policy in *Gasperini*. That diversity case concerned the standard for determining when the large size of a jury verdict warrants a new trial. Federal and state courts alike had generally employed a "shock the conscience" test in reviewing jury awards for excessiveness. See 518 U. S., at 422. Federal courts did so pursuant to Federal Rule 59(a) which, as worded at the time of *Gasperini*, instructed that a trial court could grant a new trial "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed. Rule Civ. Proc. 59(a) (West 1995). In an effort to provide greater control, New York prescribed procedures under which jury verdicts would be examined to determine whether they "deviate[d] materially from what would be reasonable compensation." See *Gasperini*, 518 U. S., at 423–425 (quoting CPLR §5501(c)). This Court held that Rule 59(a) did not inhibit federal-court accommodation of New York's invigorated test.

Most recently, in *Semtek*, we addressed the claim-preclusive effect of a federal-court judgment dismissing a diversity action on the basis of a California statute of limitations. The case came to us after the same plaintiff

renewed the same fray against the same defendant in a Maryland state court.  (Plaintiff chose Maryland because that State's limitations period had not yet run.)  We held that Federal Rule 41(b), which provided that an involuntary dismissal "operate[d] as an adjudication on the merits," did not bar maintenance of the renewed action in Maryland.  To hold that Rule 41(b) precluded the Maryland courts from entertaining the case, we said, "would arguably violate the jurisdictional limitation of the Rules Enabling Act," 531 U. S., at 503, and "would in many cases violate [*Erie*'s] federalism principle," *id.*, at 504.

In sum, both before and after *Hanna*, the above-described decisions show, federal courts have been cautioned by this Court to "interpre[t] the Federal Rules . . . with sensitivity to important state interests," *Gasperini*, 518 U. S., at 427, n. 7, and a will "to avoid conflict with important state regulatory policies," *id.*, at 438, n. 22 (internal quotation marks omitted).[2]   The Court veers

_____

[2]JUSTICE STEVENS stakes out common ground on this point:  "[F]ederal rules," he observes, "must be interpreted with some degree of 'sensitivity to important state interests and regulatory policies,' . . . and applied to diversity cases against the background of Congress' command that such rules not alter substantive rights and with consideration of 'the degree to which the Rule makes the character and result of the federal litigation stray from the course it would follow in state courts,' *Hanna* [v. *Plumer*], 380 U. S. [460, 473 (1965)]."  *Ante*, at 3. (opinion concurring in part and concurring in judgment).  See also *ante*, at 4 ("A 'state procedural rule, though undeniably procedural in the ordinary sense of the term' may exist 'to influence substantive outcomes,' . . . and may in some instances become so bound up with the state-created right or remedy that it defines the scope of that substantive right or remedy." (some internal quotation marks omitted)); *ante*, at 5 ("When a State chooses to use a traditionally procedural vehicle as a means of defining the scope of substantive rights or remedies, federal courts must recognize and respect that choice.").  Nevertheless, JUSTICE STEVENS sees no reason to read Rule 23 with restraint in this particular case; the Federal Rule preempts New York's damages limitation, in his view, because §901(b) is "a procedural rule that is not part of New York's substantive law."  *Ante*, at 1.  This characterization of §901(b) does not

away from that approach—and conspicuously, its most recent reiteration in *Gasperini*, *ante*, at 11, n. 7—in favor of a mechanical reading of Federal Rules, insensitive to state interests and productive of discord.

C

Our decisions instruct over and over again that, in the adjudication of diversity cases, state interests—whether advanced in a statute, *e.g.*, *Cohen*, or a procedural rule, *e.g.*, *Gasperini*—warrant our respectful consideration. Yet today, the Court gives no quarter to New York's limitation on statutory damages and requires the lower courts to thwart the regulatory policy at stake: To prevent excessive damages, New York's law controls the penalty to which a defendant may be exposed in a single suit. The story behind §901(b)'s enactment deserves telling.

In 1975, the Judicial Conference of the State of New York proposed a new class-action statute designed "to set up a flexible, functional scheme" that would provide "an effective, but controlled group remedy." Judicial Conference Report on CPLR, reprinted in 1975 N. Y. Laws pp. 1477, 1493 (McKinney). As originally drafted, the legislation addressed only the procedural aspects of class actions; it specified, for example, five prerequisites for certification, eventually codified at §901(a), that closely tracked those listed in Rule 23. See CPLR §901(a) (requiring, for class certification, numerosity, predominance, typicality, adequacy of representation, and superiority).

While the Judicial Conference proposal was in the New York Legislature's hopper, "various groups advocated for the addition of a provision that would prohibit class action plaintiffs from being awarded a statutorily-created penalty

———————

mirror reality, as I later explain. See *infra*, at 17–24. But a majority of this Court, it bears emphasis, agrees that Federal Rules should be read with moderation in diversity suits to accommodate important state concerns.

. . . except when expressly authorized in the pertinent statute." *Sperry* v. *Crompton Corp.*, 8 N. Y. 3d 204, 211, 863 N. E. 2d 1012, 1015 (2007). These constituents "feared that recoveries beyond actual damages could lead to excessively harsh results." *Ibid.* "They also argued that there was no need to permit class actions . . . [because] statutory penalties . . . provided an aggrieved party with a sufficient economic incentive to pursue a claim." *Ibid.* Such penalties, constituents observed, often far exceed a plaintiff's actual damages. "When lumped together," they argued, "penalties and class actions produce overkill." Attachment to Letter from G. Perkinson, New York State Council of Retail Merchants, Inc., to J. Gribetz, Executive Chamber (June 4, 1975) (Legislative Report), Bill Jacket, L. 1975, Ch. 207.

Aiming to avoid "annihilating punishment of the defendant," the New York Legislature amended the proposed statute to bar the recovery of statutory damages in class actions. V. Alexander, Practice Commentaries, C901:11, reprinted in 7B McKinney's Consolidated Laws of New York Ann., p. 104 (2006) (internal quotation marks omitted). In his signing statement, Governor Hugh Carey stated that the new statute "empowers the court to prevent abuse of the class action device and provides *a controlled remedy*." Memorandum on Approving L. 1975, Ch. 207, reprinted in 1975 N. Y. Laws, at 1748 (emphasis added).

"[T]he final bill . . . was the result of a compromise among competing interests." *Sperry*, 8 N. Y. 3d, at 211, 863 N. E. 2d, at 1015. Section 901(a) allows courts leeway in deciding whether to certify a class, but §901(b) rejects the use of the class mechanism to pursue the particular remedy of statutory damages. The limitation was not designed with the fair conduct or efficiency of litigation in mind. Indeed, suits seeking statutory damages are arguably *best* suited to the class device because individual proof

of actual damages is unnecessary. New York's decision instead to block class-action proceedings for statutory damages therefore makes scant sense, except as a means to a manifestly substantive end: Limiting a defendant's liability in a single lawsuit in order to prevent the exorbitant inflation of penalties—remedies the New York Legislature created with individual suits in mind.[3]

## D

Shady Grove contends—and the Court today agrees—that Rule 23 unavoidably preempts New York's prohibition on the recovery of statutory damages in class actions. The Federal Rule, the Court emphasizes, states that Shady Grove's suit "may be" maintained as a class action, which conflicts with §901(b)'s instruction that it "may not" so proceed. *Ante*, at 4 (internal quotation marks omitted and emphasis deleted). Accordingly, the Court insists, §901(b) "cannot apply in diversity suits unless Rule 23 is ultra vires." *Ibid.* Concluding that Rule 23 does not violate the Rules Enabling Act, the Court holds that the federal provision controls Shady Grove's ability to seek, on behalf of a class, a statutory penalty of over $5,000,000. *Ante*, at 12–16 (plurality opinion); *ante*, at 17–22 (STEVENS, J., concurring in part and concurring in judgment).

The Court, I am convinced, finds conflict where none is

_____

[3] Even in the mine-run case, a class action can result in "potentially ruinous liability." Advisory Committee's Notes on Fed. Rule Civ. Proc. 23, 28 U. S. C. App., p. 143. A court's decision to certify a class accordingly places pressure on the defendant to settle even unmeritorious claims. See, *e.g., Coopers & Lybrand* v. *Livesay*, 437 U. S. 463, 476 (1978). When representative plaintiffs seek statutory damages, pressure to settle may be heightened because a class action poses the risk of massive liability unmoored to actual injury. See, *e.g., Ratner* v. *Chemical Bank New York Trust Co.*, 54 F. R. D. 412, 416 (SDNY 1972) (exercising "considerable discretion of a pragmatic nature" to refuse to certify a class because the plaintiffs suffered negligible actual damages but sought statutory damages of $13,000,000).

necessary. Mindful of the history behind §901(b)'s enact-
ment, the thrust of our precedent, and the substantive-
rights limitation in the Rules Enabling Act, I conclude, as
did the Second Circuit and every District Court to have
considered the question in any detail,[4] that Rule 23 does
not collide with §901(b). As the Second Circuit well un-
derstood, Rule 23 prescribes the considerations relevant to
class certification and postcertification proceedings—but it
does not command that a particular remedy be available
when a party sues in a representative capacity. See 549
F. 3d 137, 143 (2008).[5] Section 901(b), in contrast, trains
on that latter issue. Sensibly read, Rule 23 governs proce-
dural aspects of class litigation, but allows state law to
control the size of a monetary award a class plaintiff may
pursue.

_____

[4] See, *e.g., In re Automotive Refinishing Paint Antitrust Litigation*,
515 F. Supp. 2d 544, 549–551 (ED Pa. 2007); *Leider* v. *Ralfe*, 387 F.
Supp. 2d 283, 289–292 (SDNY 2005); *Dornberger* v. *Metropolitan Life
Insurance Co.*, 182 F. R. D. 72, 84 (SDNY 1999). See also *Weber* v. *U. S.
Sterling Securities, Inc.*, 282 Conn. 722, 738–739, 914 A. 2d 816, 827–
828 (2007) (section 901(b) applied in Connecticut state court to action
governed by New York substantive law).

[5] Shady Grove projects that a dispensation in favor of Allstate would
require "courts in all diversity class actions . . . [to] look to state rules
and decisional law rather than to Rule 23 . . . in making their class
certification decisions." Brief for Petitioner 55. This slippery-slope
projection is both familiar and false. Cf. R. Bork, The Tempting of
America 169 (1990) ("Judges and lawyers live on the slippery slope of
analogies; they are not supposed to ski it to the bottom."). In this case,
CPLR §901(a) lists the state-law prerequisites for class certification,
but Allstate does not contend that §901(a) overrides Rule 23. Brief for
Respondent 18 ("There is no dispute that the criteria for class certifica-
tion under state law do not apply in federal court; that is the ground
squarely occupied by Rule 23."). Federal courts sitting in diversity have
routinely applied Rule 23's certification standards, rather than compa-
rable state provisions. See, *e.g., In re New Motor Vehicles Canadian
Export Antitrust Litigation*, 522 F. 3d 6, 18–24 (CA1 2008); Order and
Reasons in *In re Katrina Canal Breaches Consolidated Litigation*, Civ.
Action No. 05–4182 (ED La., Aug. 6, 2009).

In other words, Rule 23 describes a method of enforcing a claim for relief, while §901(b) defines the dimensions of the claim itself. In this regard, it is immaterial that §901(b) bars statutory penalties in wholesale, rather than retail, fashion. The New York Legislature could have embedded the limitation in every provision creating a cause of action for which a penalty is authorized; §901(b) operates as shorthand to the same effect. It is as much a part of the delineation of the claim for relief as it would be were it included claim by claim in the New York Code.

The Court single-mindedly focuses on whether a suit "may" or "may not" be maintained as a class action. See *ante*, at 4–6. Putting the question that way, the Court does not home in on the reason *why*. Rule 23 authorizes class treatment for suits satisfying its prerequisites because the class mechanism generally affords a fair and efficient way to aggregate claims for adjudication. Section 901(b) responds to an entirely different concern; it does not allow class members to recover statutory damages because the New York Legislature considered the result of adjudicating such claims en masse to be exorbitant.[6] The fair and efficient *conduct* of class litigation is the legitimate concern of Rule 23; the *remedy* for an infraction of state law, however, is the legitimate concern of the State's lawmakers and not of the federal rulemakers. Cf. Ely, The Irrepressible Myth of *Erie*, 87 Harv. L. Rev. 693, 722 (1974) (It is relevant "whether the state provision embodies a substantive policy or represents only a procedural disagreement with the federal rulemakers respecting the

---

[6] The Court disputes the strength of the evidence of legislative intent, see *ante*, at 9, but offers no alternative account of §901(b)'s purpose. Perhaps this silence indicates how very hard it would be to ascribe to §901(b) *any* purpose bound up with the fairness and efficiency of processing cases. On its face, the proscription is concerned with remedies, *i.e.*, the availability of statutory damages in a lawsuit. Legislative history confirms this objective, but is not essential to revealing it.

fairest and most efficient way of conducting litigation.").

　Suppose, for example, that a State, wishing to cap damages in class actions at $1,000,000, enacted a statute providing that "a suit to recover more than $1,000,000 may not be maintained as a class action." Under the Court's reasoning—which attributes dispositive significance to the words "may not be maintained"—Rule 23 would preempt this provision, nevermind that Congress, by authorizing the promulgation of rules of procedure for federal courts, surely did not intend to displace state-created ceilings on damages.[7] The Court suggests that the analysis might differ if the statute "limit[ed] the remedies available in an existing class action," *ante*, at 7, such that Rule 23 might not conflict with a state statute prescribing that "no more than $1,000,000 may be recovered in a class action." There is no real difference in the purpose and intended effect of these two hypothetical statutes. The notion that one directly impinges on Rule 23's domain, while the other does not, fundamentally misperceives the office of Rule 23.[8]

_____

　[7]There is, of course, a difference between "justly administering [a] remedy," *Sibbach* v. *Wilson & Co.*, 312 U. S. 1, 14 (1941), and prescribing the content of that remedy; if Rule 23 can be read to increase a plaintiff's recovery from $1,000,000 to some greater amount, the Rule has arguably "enlarge[d] . . . [a] substantive right" in violation of the Rules Enabling Act. 28 U. S. C. §2072(b). The plurality appears to acknowledge this point, stating that the Federal Rules we have found to be in compliance with the Act have not "altered . . . available remedies." *Ante*, at 13. But the Court's relentless reading of Rule 23 today does exactly that: The Federal Rule, it says, authorizes the recovery of class-size statutory damages even though the New York provision instructs that such penalties shall not be available.

　[8]The Court states that "[w]e cannot rewrite [a state law] to reflect our perception of legislative purpose." *Ante*, at 9. But we can, of course, *interpret the Federal Rules* in light of a State's regulatory policy to decide whether and to what extent a Rule preempts state law. See *supra*, at 3–7. Just as we read Federal Rule 3 in *Walker* v. *Armco Steel Corp.,* 446 U. S. 740, 751 (1980), not to govern when a suit commences

The absence of an inevitable collision between Rule 23 and §901(b) becomes evident once it is comprehended that a federal court sitting in diversity can accord due respect to both state and federal prescriptions.  Plaintiffs seeking to vindicate claims for which the State has provided a statutory penalty may pursue relief through a class action if they forgo statutory damages and instead seek actual damages or injunctive or declaratory relief; any putative class member who objects can opt out and pursue actual damages, if available, and the statutory penalty in an individual action.  See, *e.g., Mendez* v. *The Radec Corp.*, 260 F. R. D. 38, 55 (WDNY 2009); *Brzychnalski* v. *Unesco, Inc.*, 35 F. Supp. 2d 351, 353 (SDNY 1999).[9]  See also Alexander, Practice Commentaries, at 105 ("Even if a statutory penalty or minimum recovery is involved, most courts hold that it can be waived, thus confining the class recovery to actual damages and eliminating the bar of CPLR 901(b).").  In this manner, the Second Circuit ex-

_____

for purposes of tolling a state statute of limitations (although the Rule indisputably controls when an action commences for federal procedural purposes), so too we could read Rule 23 not to direct when a class action may be maintained for purposes of recovering statutory damages prescribed by state law.  On this reading of Rule 23, no rewriting of §901(b) is necessary to avoid a conflict.

[9] The New York Legislature appears to have anticipated this result. In discussing the remedial bar effected by §901(b), the bill's sponsor explained that a "statutory class action for actual damages would still be permissible."  S. Fink, [Sponsor's] Memorandum, Bill Jacket, L. 1975, Ch. 207.  See also State Consumer Protection Board Memorandum (May 29, 1975), Bill Jacket, L. 1975, Ch. 207.  On this understanding, New York courts routinely authorize class actions when the class waives its right to receive statutory penalties.  See, *e.g., Cox* v. *Microsoft Corp.*, 8 App. Div. 3d 39, 778 N. Y. S. 2d 147 (2004); *Pesantez* v. *Boyle Env. Servs., Inc.*, 251 App. Div. 2d 11, 673 N. Y. S. 2d 659 (1998); *Ridge Meadows Homeowners' Assn., Inc.* v. *Tara Development Co.*, 242 App. Div. 2d 947, 665 N. Y. S. 2d 361 (1997); *Super Glue Corp.* v. *Avis Rent A Car System, Inc.*, 132 App. Div. 2d 604, 517 N. Y. S. 2d 764 (1987); *Weinberg* v. *Hertz Corp.*, 116 App. Div. 2d 1, 499 N. Y. S. 2d 693 (1986).

plained, "Rule 23's procedural requirements for class actions can be applied along with the substantive requirement of CPLR 901(b)." 549 F. 3d, at 144. In sum, while phrased as responsive to the question whether certain class actions may begin, §901(b) is unmistakably aimed at controlling how those actions must end. On that remedial issue, Rule 23 is silent.

Any doubt whether Rule 23 leaves §901(b) in control of the remedial issue at the core of this case should be dispelled by our *Erie* jurisprudence, including *Hanna*, which counsels us to read Federal Rules moderately and cautions against stretching a rule to cover every situation it could conceivably reach.[10] The Court states that "[t]here is no reason . . . to read Rule 23 as addressing only whether claims made eligible for class treatment by some *other* law should be certified as class actions." *Ante*, at 5. To the contrary, *Palmer*, *Ragan*, *Cohen*, *Walker*, *Gasperini*, and *Semtek* provide good reason to look to the law that creates the right to recover. See *supra*, at 4–7. That is plainly so on a more accurate statement of what is at stake: Is there any reason to read Rule 23 as authorizing a claim for relief when the State that created the remedy disallows its pursuit on behalf of a class? None at all is the answer our federal system should give.

Notably, New York is not alone in its effort to contain penalties and minimum recoveries by disallowing class relief; Congress, too, has precluded class treatment for certain claims seeking a statutorily designated minimum recovery. See, *e.g.,* 15 U. S. C. §1640(a)(2)(B) (Truth in Lending Act) ("[I]n the case of a class action . . . no mini-

---

[10] The plurality notes that "we have rejected every statutory challenge to a Federal Rule that has come before us." *Ante*, at 13. But it omits that we have interpreted Rules with due restraint, including Rule 23, thus diminishing prospects for the success of such challenges. See *Ortiz* v. *Fibreboard Corp.*, 527 U. S. 815, 842 (1999); *Amchem Products, Inc.* v. *Windsor*, 521 U. S. 591, 612–613 (1997); *supra*, at 4–8.

mum recovery shall be applicable."); §1693m(a)(2)(B)
(Electronic Fund Transfer Act) (same); 12 U. S. C.
§4010(a)(2)(B)(i) (Expedited Fund Availability Act) (same).
Today's judgment denies to the States the full power
Congress has to keep certain monetary awards within
reasonable bounds. Cf. *Beard* v. *Kindler*, 558 U. S. ___,
___ (2009) (slip op., at 8) ("In light of . . . federalism and
comity concerns . . . it would seem particularly strange to
disregard state . . . rules that are substantially similar to
those to which we give full force in our own courts.").
States may hesitate to create determinate statutory penal-
ties in the future if they are impotent to prevent federal-
court distortion of the remedy they have shaped.[11]

By finding a conflict without considering whether Rule
23 rationally should be read to avoid any collision, the
Court unwisely and unnecessarily retreats from the feder-
alism principles undergirding *Erie*. Had the Court re-
flected on the respect for state regulatory interests en-
dorsed in our decisions, it would have found no cause to
interpret Rule 23 so woodenly—and every reason not to do
so. Cf. Traynor, 37 Tex. L. Rev., at 669 ("It is bad enough
for courts to prattle unintelligibly about choice of law, but

———————

[11] States have adopted a variety of formulations to limit the use of
class actions to gain certain remedies or to pursue certain claims, as
illustrated by the 96 examples listed in Allstate's brief. Apps. to Brief
for Respondent. The Court's "one-size-fits-all" reading of Rule 23, *ante*,
at 4, likely prevents the enforcement of *all* of these statutes in diversity
actions—including the numerous state statutory provisions that, like
§901(b), attempt to curb the recovery of statutory damages. See, *e.g.,*
Cal. Civ. Code Ann. §2988.5(a)(2) (West 1993); Colo. Rev. Stat. Ann.
§12–14.5–235(d) (2009); Conn. Gen. Stat. §36a–683(a) (2009); Haw.
Rev. Stat. §489–7.5(b)(1) (2008); Ind. Code §24–4.5–5–203(a)(2) (2004);
Ky. Rev. Stat. Ann. §367.983(1)(c) (West 2006); Mass. Gen. Laws, ch.
167B, §20(a)(2)(B) (2008); Mich. Comp. Laws Ann. §493.112(3)(c) (West
2005); N. M. Stat. Ann. §58–16–15(B) (Lexis 2004); Ohio Rev. Code
Ann. §1351.08(A) (West 2004); Okla. Stat., Tit. 14A, §5–203(1) (2007
Supp.); Wyo. Stat. Ann. §40–19–119(a)(iii) (2009).

unforgiveable when inquiry might have revealed that there was no real conflict.").

## II

Because I perceive no unavoidable conflict between Rule 23 and §901(b), I would decide this case by inquiring "whether application of the [state] rule would have so important an effect upon the fortunes of one or both of the litigants that failure to [apply] it would be likely to cause a plaintiff to choose the federal court." *Hanna*, 380 U. S., at 468, n. 9. See *Gasperini*, 518 U. S., at 428.

Seeking to pretermit that inquiry, Shady Grove urges that the class-action bar in §901(b) must be regarded as "procedural" because it is contained in the CPLR, which "govern[s] the *procedure* in civil judicial proceedings *in all courts of the state*." Brief for Petitioner 34 (quoting CPLR §101; emphasis in original). Placement in the CPLR is hardly dispositive. The provision held "substantive" for *Erie* purposes in *Gasperini* is also contained in the CPLR (§5501(c)), as are limitations periods, §201 *et seq.*, prescriptions plainly "substantive" for *Erie* purposes however they may be characterized for other purposes, see *York*, 326 U. S., at 109–112. See also, *e.g.*, 1 Restatement (Second) of Conflict of Laws §133, Reporter's Note, p. 369 (1969) (hereinafter Restatement) ("Under the rule of Erie . . . the federal courts have classified the burden of persuasion as to contributory negligence as a matter of substantive law that is governed by the rule of the State in which they sit even though the courts of that State have characterized their rule as procedural for choice-of-law purposes."); Cook, "Substance" and "Procedure" in the Conflict of Laws, 42 Yale L. J. 333 (1933).

Shady Grove also ranks §901(b) as "procedural" because "nothing in [the statute] suggests that it is limited to rights of action based on New York state law, as opposed to federal law or the law of other states"; instead it "ap-

plies to actions seeking penalties under *any* statute." Brief
for Petitioner 35–36. See also *ante*, at 17–18 (STEVENS, J.,
concurring in part and concurring in judgment) (Section
901(b) cannot "be understood as a rule that . . . serves the
function of defining New York's rights or remedies" because
its "text . . . expressly and unambiguously applies not only
to claims based on New York law but also to claims based on
federal law or the law of any other State.").

It is true that §901(b) is not specifically *limited* to claims
arising under New York law. But neither is it expressly
*extended* to claims arising under foreign law. The rule
prescribes, without elaboration either way, that "an action
to recover a penalty . . . may not be maintained as a class
action." We have often recognized that "general words"
appearing in a statute may, in fact, have limited applica-
tion; "[t]he words 'any person or persons,'" for example,
"are broad enough to comprehend every human being.
But general words must not only be limited to cases within
the jurisdiction of the state, but also to those objects to
which the legislature intended to apply them." *United
States* v. *Palmer*, 3 Wheat. 610, 631 (1818) (opinion for the
Court by Marshall, C. J.). See also *Small* v. *United States*,
544 U. S. 385, 388 (2005) ("In law, a legislature that uses
the statutory phrase 'any person' may or may not mean to
include 'persons' outside the jurisdiction of the state."
(some internal quotation marks omitted)); *Flora* v. *United
States*, 362 U. S. 145, 149 (1960) (The term "'any sum' is a
catchall [phrase,] . . . but to say this is not to define what
it catches.").

Moreover, Shady Grove overlooks the most likely expla-
nation for the absence of limiting language: New York
legislators make law with New York plaintiffs and defen-
dants in mind, *i.e.*, as if New York were the universe. See
Baxter, Choice of Law and the Federal System, 16 Stan.
L. Rev. 1, 11 (1963) ("[L]awmakers often speak in univer-
sal terms but must be understood to speak with reference

to their constituents."); cf. *Smith* v. *United States*, 507 U. S. 197, 204, n. 5 (1993) (presumption against extraterritoriality rooted in part in "the commonsense notion that Congress generally legislates with domestic concerns in mind").

The point was well put by Brainerd Currie in his seminal article on governmental interest analysis in conflict-of-laws cases. The article centers on a now-archaic Massachusetts law that prevented married women from binding themselves by contract as sureties for their husbands. Discussing whether the Massachusetts prescription applied to transactions involving foreign factors (a foreign forum, foreign place of contracting, or foreign parties), Currie observed:

> "When the Massachusetts legislature addresses itself to the problem of married women as sureties, the undeveloped image in its mind is that of *Massachusetts* married women, husbands, creditors, transactions, courts, and judgments. In the history of Anglo-American law the domestic case has been normal, the conflict-of-laws case marginal." Married Women's Contracts: A Study in Conflict-of-Laws Method, 25 U. Chi. L. Rev. 227, 231 (1958) (emphasis added).

Shady Grove's suggestion that States must specifically limit their laws to domestic rights of action if they wish their enactments to apply in federal diversity litigation misses the obvious point: State legislators generally do not focus on an interstate setting when drafting statutes.[12]

––––––––––

[12] Shady Grove's argument that §901(b) is procedural based on its possible application to foreign claims is also out of sync with our *Erie* decisions, many of them involving state statutes of similarly unqualified scope. The New Jersey law at issue in *Cohen* v. *Beneficial Industrial Loan Corp.*, 337 U. S. 541, 544, n. 1 (1949), for example, required plaintiffs to post a bond as security for costs in "*any* [stockholder's derivative] action." (quoting 1945 N. J. Laws ch. 131 (emphasis

Shady Grove also observes that a New York court has applied §901(b) to a federal claim for relief under the Telephone Consumer Protection Act of 1991 (TCPA), 47 U. S. C. §227, see *Rudgayzer & Gratt* v. *Cape Canaveral Tour & Travel, Inc.*, 22 App. Div. 3d 148, 799 N. Y. S. 2d 795 (2005), thus revealing §901(b)'s "procedural" cast. Brief for Petitioner 36. We note first that the TCPA itself calls for the application of state law. See *Rudgayzer*, 22 App. Div. 3d, at 149–150, 799 N. Y. S. 2d, at 796–797 (federal action authorized in state court "if otherwise permitted by the laws or rules of the court of [the] State" (quoting 47 U. S. C. §227(b)(3))). See also *Gottlieb* v. *Carnival Corp.*, 436 F. 3d 335, 342 (CA2 2006) (Sotomayor, J.) ("Congress sought, via the TCPA, to enact the functional equivalent of a state law."). The TCPA, the Supreme Court of Connecticut has recognized, thus "carves out an exception to th[e] general rule" that "when *Erie* . . . is reversed . . . , a state court hearing a federal case is normally required to apply federal substantive law": "Under §227(b)(3) . . . it is state substantive law that determines, as a preliminary matter, whether a federal action under the act may be brought in state court." *Weber* v. *U. S. Sterling Securities, Inc.*, 282 Conn. 722, 736, 924 A. 2d 816, 826 (2007) (in TCPA action governed by New York substantive law, §901(b) applied even though the claim was pursued in Connecticut state court).

————————

added)). See also, *e.g.*, *Walker*, 446 U. S., at 742–743, and n. 4 (Oklahoma statute deemed "[a]n action" commenced for purposes of the statute of limitations upon service of the summons (quoting Okla. Stat., Tit. 12, §97 (1971)). Our characterization of a state statute as substantive for *Erie* purposes has never hinged on whether the law applied only to domestic causes of action. To the contrary, we have ranked as substantive a variety of state laws that the state courts apply to federal and out-of-state claims, including statutes of limitations and burden-of-proof prescriptions. See *infra*, at 21.

Moreover, statutes qualify as "substantive" for *Erie* purposes even when they have "procedural" thrusts as well. See, *e.g.*, *Cohen*, 337 U. S., at 555; cf. *Woods* v. *Interstate Realty Co.*, 337 U. S. 535, 536–538, and n. 1 (1949) (holding diversity case must be dismissed based on state statute that, by its terms, governed only proceedings in state court). Statutes of limitations are, again, exemplary. They supply "substantive" law in diversity suits, see *York*, 326 U. S., at 109–112, even though, as Shady Grove acknowledges, state courts often apply the forum's limitations period as a "procedural" bar to claims arising under the law of another State, see Reply Brief 24, n. 16; Tr. of Oral Arg. 16–17. See also Restatement §§142–143 (when adjudicating a foreign cause of action, State may use either its own or the foreign jurisdiction's statute of limitations, whichever is shorter). Similarly, federal courts sitting in diversity give effect to state laws governing the burden of proving contributory negligence, see *Palmer* v. *Hoffman*, 318 U. S. 109, 177 (1943), yet state courts adjudicating foreign causes of action often apply their own local law to this issue. See Restatement §133 and Reporter's Note.

In short, Shady Grove's effort to characterize §901(b) as simply "procedural" cannot successfully elide this fundamental norm: When no federal law or rule is dispositive of an issue, and a state statute is outcome affective in the sense our cases on *Erie* (pre- and post-*Hanna*) develop, the Rules of Decision Act commands application of the State's law in diversity suits. *Gasperini*, 518 U. S., at 428; *Hanna*, 380 U. S., at 468, n. 9; *York*, 326 U. S., at 109. As this case starkly demonstrates, if federal courts exercising diversity jurisdiction are compelled by Rule 23 to award statutory penalties in class actions while New York courts are bound by §901(b)'s proscription, "substantial variations between state and federal [money judgments] may be expected." *Gasperini*, 518 U. S., at 430 (quoting *Hanna*,

380 U. S., at 467–468 (internal quotation marks omitted)). The "variation" here is indeed "substantial." Shady Grove seeks class relief that is *ten thousand times* greater than the individual remedy available to it in state court. As the plurality acknowledges, *ante*, at 22, forum shopping will undoubtedly result if a plaintiff need only file in federal instead of state court to seek a massive monetary award explicitly barred by state law. See *Gasperini*, 518 U. S., at 431 ("*Erie* precludes a recovery in federal court significantly larger than the recovery that would have been tolerated in state court.").[13] The "accident of diversity of citizenship," *Klaxon Co.* v. *Stentor Elec. Mfg. Co.*, 313 U. S. 487, 496 (1941), should not subject a defendant to such augmented liability. See *Hanna*, 380 U. S., at 467 ("The *Erie* rule is rooted in part in a realization that it would be unfair for the character or result of a litigation materially to differ because the suit had been brought in a federal court.").

It is beyond debate that "a statutory cap on damages would supply substantive law for *Erie* purposes." *Gasperini*, 518 U. S., at 428. See also *id.*, at 439–440 (STEVENS, J., dissenting) ("A state-law ceiling on allowable damages . . . is a substantive rule of decision that federal courts must apply in diversity cases governed by New York law."); *id.*, at 464 (SCALIA, J., dissenting) ("State substantive law controls what injuries are compensable and in what amount."). In *Gasperini*, we determined that New York's standard for measuring the alleged excessive-

---

[13] In contrast, many "state rules ostensibly addressed to procedure," *ante*, at 10 (majority opinion)—including pleading standards and rules governing summary judgment, pretrial discovery, and the admissibility of certain evidence—would not so hugely impact forum choices. It is difficult to imagine a scenario that would promote more forum shopping than one in which the difference between filing in state and federal court is the difference between a potential award of $500 and one of $5,000,000.

ness of a jury verdict was designed to provide a control analogous to a damages cap. *Id.*, at 429. The statute was framed as "a procedural instruction," we noted, "but the State's objective [wa]s manifestly substantive." *Ibid.*

*Gasperini*'s observations apply with full force in this case. By barring the recovery of statutory damages in a class action, §901(b) controls a defendant's maximum liability in a suit seeking such a remedy. The remedial provision could have been written as an explicit cap: "In any class action seeking statutory damages, relief is limited to the amount the named plaintiff would have recovered in an individual suit." That New York's Legislature used other words to express the very same meaning should be inconsequential.

We have long recognized the impropriety of displacing, in a diversity action, state-law limitations on state-created remedies. See *Woods*, 337 U. S., at 538 (in a diversity case, a plaintiff "barred from recovery in the state court . . . should likewise be barred in the federal court"); *York*, 326 U. S., at 108–109 (federal court sitting in diversity "cannot afford recovery if the right to recover is made unavailable by the State nor can it substantively affect the enforcement of the right as given by the State"). Just as *Erie* precludes a federal court from entering a deficiency judgment when a State has "authoritatively announced that [such] judgments cannot be secured within its borders," *Angel* v. *Bullington*, 330 U. S. 183, 191 (1947), so too *Erie* should prevent a federal court from awarding statutory penalties aggregated through a class action when New York prohibits this recovery. See also *Ragan*, 337 U. S., at 533 ("Where local law qualifies or abridges [a claim], the federal court must follow suit. Otherwise there is a different measure of the cause of action in one court than in the other, and the principle of *Erie* . . . is transgressed."). In sum, because "New York substantive law governs [this] claim for relief, New York law . . . guide[s]

the allowable damages." *Gasperini*, 518 U. S., at 437.[14]

### III

The Court's erosion of *Erie*'s federalism grounding impels me to point out the large irony in today's judgment. Shady Grove is able to pursue its claim in federal court only by virtue of the recent enactment of the Class Action Fairness Act of 2005 (CAFA), 28 U. S. C. §1332(d). In CAFA, Congress opened federal-court doors to state-law-based class actions so long as there is minimal diversity, at least 100 class members, and at least $5,000,000 in controversy. *Ibid.* By providing a federal forum, Congress sought to check what it considered to be the overreadiness of some state courts to certify class actions. See, *e.g.,* S. Rep. No. 109–14, p. 4 (2005) (CAFA prevents lawyers from "gam[ing] the procedural rules [to] keep nationwide or multi-state class actions in state courts whose judges have reputations for readily certifying classes." (internal quotation marks omitted)); *id.*, at 22 (disapproving "the 'I never met a class action I didn't like' approach to class certification" that "is prevalent in state courts in some localities"). In other words, Congress envisioned fewer—not more—class actions overall. Congress surely never anticipated that CAFA would make federal courts a mecca for suits of the kind Shady Grove has launched: class actions seeking state-created penalties for claims arising under state law—claims that would be barred from class treatment in the State's own courts. Cf. *Woods*, 337 U. S., at 537 ("[T]he policy of *Erie* . . . preclude[s] maintenance in

---

[14] There is no question that federal courts can "give effect to the substantive thrust of [§901(b)] without untoward alteration of the federal scheme for the trial and decision of civil cases." *Gasperini*, 518 U. S., at 426. There is no risk that individual plaintiffs seeking statutory penalties will flood federal courts with state-law claims that could be managed more efficiently on a class basis; the diversity statute's amount-in-controversy requirement ensures that small state-law disputes remain in state court.

. . . federal court . . . of suits to which the State ha[s] closed its courts.").[15]

*          *          *

I would continue to approach *Erie* questions in a manner mindful of the purposes underlying the Rules of Decision Act and the Rules Enabling Act, faithful to precedent, and respectful of important state interests. I would therefore hold that the New York Legislature's limitation on the recovery of statutory damages applies in this case, and would affirm the Second Circuit's judgment.

------------

[15] It remains open to Congress, of course, to exclude from federal-court jurisdiction under the Class Action Fairness Act of 2005, 28 U. S. C. §1332(d), claims that could not be maintained as a class action in state court.